IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, and ALLSTATE VEHICLE & PROPERTY INSURANCE COMPANY,**<br><br>            **Plaintiffs**<br>     **v.**<br><br>**ELECTROLUX HOME PRODUCTS, INC.**<br><br>            **Defendant** | **Case No.: 16-cv-04276 EGS** |

**PLAINTIFFS' OMNIBUS MOTION IN LIMINE TO PRECLUDE
CERTAIN EVIDENCE**

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company ("Allstate"), by and through their attorneys, submit this Omnibus Motion in Limine to Preclude Certain Evidence in accordance with the scheduling order.

**I.     Introduction and Summary of Argument**

This strict products liability and negligence action arises from property damage caused by eight defective Electrolux "ball-hitch" clothes dryers. Each dryer ignited lint particulate that the dryer had accumulated inside a hidden space behind the drum. Thereafter, fires spread from the hidden space behind the drum to the plastic front air duct and plastic blower housing, which were adjacent to and underneath the drum. The plastics' combustion caused smoke and flame to escape the confines of the dryer cabinet and damage real and personal property insured by Allstate. Allstate paid eight claims as a result of the fires and brought this subrogation suit

against Electrolux seeking compensatory and punitive damages.

Electrolux-manufactured ball-hitch dryers, including the eight directly involved in this case, are unreasonably dangerous and defective regardless of whether the consumer expectations test or risk-utility test is applied. No reasonable consumer expects that her clothes dryer will perform asymptomatically and then erupt into flames during normal use. No consumer expects that lint separated from the tumbling load can migrate backwards, against the dryer's airflow, and move through the tiny perforations in the rear of the steel drum, become trapped and accumulate in a hidden space behind the drum. No consumer expects that her dryer can cause combustible lint to collect on or near the electric heating element or combustion chamber, heat sources that produce temperatures far hotter than necessary to cause lint to ignite. No consumer expects that using her dryer is so dangerous that the machine must be completely disassembled, cleaned, and reassembled *at least* every 18 months to function reasonably safely. No consumer expects that her dryer itself will combust in the event it malfunctions. There is no argument that Electrolux's ball-hitch dryer is as safe as an ordinary consumer expects.

Electrolux's ball-hitch dryer also fails the risk-utility test. There is no dispute that the alleged alternative dryer design (*i.e.*, the standard "bulkhead" dryer design, which was used by other manufacturers throughout the world since at least the 1960s, and by Electrolux since 2007) is, in fact, safer because it substantially reduces the risk of internal lint ignition during use. The bulkhead design eliminated the hidden lint collection point behind the drum and protected the dryer's heat source from lint contamination. Lint that accumulates within a bulkhead dryer, plainly, is far less likely to be ignited by the bulkhead dryer's heat source.

Moreover, without switching designs, Electrolux could have made these "ball-hitch" dryers safer purely by switching from combustible plastic to steel front air ducts and blower

housings. Electrolux tested and proved that switching just these two components from plastic to steel substantially reduced the risk of external property damage if an internal dryer fire occurred. Cost was not the issue. Electrolux determined that higher production costs associated with switching from plastic to steel would be offset by a reduction in products liability because fires that occurred would cause less property damage. Despite this knowledge, and the increasing influx of property damage fire claims inundating the company, Electrolux built and sold the eight defective "ball-hitch" dryers at issue with defective plastic front air ducts and blower housings.

Electrolux is not just liable because it sold a defective product. It is also liable because it ignored or otherwise failed to comply with the standard of care. It is undisputed that a consumer product manufacturer's lawful obligation is to use engineering to reduce the severity and frequency of known and foreseeable use-hazards. Despite knowing that simple design changes (*e.g.*, ball-hitch to bulkhead, or plastics to steel) were feasible and effective at reducing the risks of fire and property damage, Electrolux steadfastly clung to its defective "ball-hitch" design and combustible plastics.

Electrolux did not warn. Electrolux's product literature is devoid of any mention of the hidden space behind the drum where lint could collect and ignite. Electrolux's manuals and labeling also fail to mention the increased risk of harm caused by Electrolux's use of combustible plastics in areas of the dryer that may be exposed to flame. Any argument to the contrary is contrived for litigation.

Even now, its misdeeds laid bare and having profited from more than a decade of selling defective dryers, Electrolux continues to try to lay blame for the property damage sustained at the feet of others. According to Electrolux, each of these fires was "caused" by some action or

inaction of the dryer user. Yet, despite the (very) varied installation conditions and circumstances, exhaust venting composition and configuration and frequency and manners of use, all eight dryers failed due to their design flaws and in a manner foreseeable to Electrolux from the factory floor - the dryers trapped and ignited lint behind the drum and failed to contain the conflagrations they initiated.

At trial, and because it has no valid substantive defense, Electrolux will attempt to avoid its legal responsibility for the damages alleged by distracting, confusing and misleading the jury. Allstate stands in the shoes of its insureds in prosecuting this case. Nothing concerning Allstate is at issue. Nevertheless, Electrolux will attempt to inject insurance into this case at every turn (just as it did during discovery) in an effort to benefit from the well-known, inherent and unfair bias against insurance companies. Allstate requires and is entitled to protection from such tactics.

Electrolux will also attempt to confuse, mislead and distract the jury from its lawful purpose of applying Pennsylvania law to the facts of this case by repeatedly referencing irrelevant voluntary minimum safety testing "standards." That is, Electrolux intends to introduce evidence that the dryers at issue in this case complied with voluntary minimum safety testing standards published by Underwriters Laboratories ("UL") and the American National Standards Institute ("ANSI") as proof that the dryers' were not defectively or negligently designed, even though none of these so-called "standards" related to long-term dryer use or the subject "ball-hitch" dryer design's unique and unreasonably dangerous design characteristics. Also, these "standards" that Electrolux wishes to tout expressly state that compliance therewith does <u>not</u> mean that a product is safe or non-defective. Even if UL or ANSI proclaimed that meeting its test standard meant that a dryer design was non-defective, which they do not, such

a proclamation would be inadmissible hearsay. Electrolux should not be permitted to distract the jury with meaningless voluntary minimum safety test standard evidence.

Also, Electrolux intends to present evidence that despite complaints about the subject dryer design's defective condition and damage and injury resulting therefrom, the United States' Consumer Product Safety Commission ("CPSC") and Japan's Ministry of Economics, Trade and Industry ("METI") took no formal action against Electrolux to prove that its products are not defective and that its conduct was not negligent. Electrolux's refusal to disclose complete records of its interaction with those government entities renders any "inaction" meaningless. There is no way for the jury to know whether Electrolux provided complete information to government investigators or otherwise fully cooperated with any government investigation as obligated by law. Introduction of evidence about government inaction would also lead to a trial within a trial about whether those bodies conducted a proper review, whether those bodies applied the laws correctly and whether, if at all, the laws, rules and regulations that were applied are similar or dissimilar to the strict products liability and negligence laws of Pennsylvania. For these and other reasons explained below, evidence of "government inaction" is inadmissible.

Similarly, Electrolux (through the testimony of its forensic consultants and/or otherwise) will attempt to argue that the number of dryer fires that occur annually, as reported by such entities as the National Fire Protection Association ("NFPA"), United States Fire Administration ("USFA") and Underwriters Laboratories ("UL"), proves that Electrolux's ball-hitch dryers are actually *more safe* than dryers manufactured by others because the number of dryer fires reported directly to, and tracked by, Electrolux annually is less than anticipated in terms of Electrolux's percentage of the overall market share.

At best, these statistics prove nothing. At worst, they are downright misleading. The data

relied upon by groups like NFPA, USFA and UL is compiled from the National Fire Incident Reporting System ("NFIRS"), which collects data about fires on a voluntary basis from local fire departments through use of a standardized survey. That survey does not ask reporters to identify the manufacturer of a dryer involved in a fire, nor does it require reporters to identify whether the dryer in question is of a particular design (that is, even if we knew an Electrolux dryer was involved, that would not tell us whether the dryer was the defective "ball-hitch" or safer bulkhead design because Electrolux has manufactured both designs). Reporters are not required to be qualified fire investigators and, in fact, may be anyone at all. There is no way to test the quality or veracity of the data. Indeed, the number of dryer fires may be under- or over-reported. All of the fires reported by NFPA, USFA and UL may, in fact, have involved Electrolux ball-hitch dryers. The difference in the numbers reported by those entities and Electrolux's numbers may be that fires involving Electrolux "ball-hitch" dryers often go unreported to Electrolux for various reasons (for example, a fire may have caused very little property damage and the victim or her insurer determined that submitting a claim to Electrolux – notorious for its "war of attrition" litigation tactics – would be more expensive than the claim was worth and therefore refrained from reporting the fire to Electrolux, or the fire may have been too destructive and the fire damage prevented investigators from identifying the manufacturer). Electrolux, as the proponent of such evidence, bears the burden of laying a proper foundation for this evidence and cannot. As such, it must be precluded.

Electrolux has indicated that it intends to call an Electrolux employee named Peter Silman as a witness at trial. Mr. Silman is a Product Safety Engineer at Electrolux. In that role, Mr. Silman provides litigation support on behalf of the company to the lawyers who defend Electrolux in dryer fire cases nationwide. Mr. Silman has no personal knowledge about the

design, testing, manufacture or performance of the subject dryers. In this case, he was designated by Electrolux as a Rule 30(b)(6) witness and testified during discovery. He testified that any knowledge he has about the design of the dryers in question is derived from his review of transcripts of testimony given by former Electrolux employees and his review of various company records supplied to him by counsel. Because he lacks the requisite personal knowledge to testify as a lay witness and has not been identified by Electrolux as a testifying expert, Mr. Silman is an incompetent witness and must be precluded from testifying at the trial of this case.

Lastly, Electrolux should be barred from any attempt to introduce evidence of "depreciation" or "actual cash value" ("ACV") from Allstate's first-party claim adjustment. Electrolux will likely introduce this evidence in an effort to undermine the value of the Allstate's property damage claims at trial.  However, ACV is an insurance term used to calculate what Allstate may owe under its policy of insurance with its insureds and bears no relation to applicable measure of damages to real or personal property available to Allstate's subrogors at law.  Such evidence or argument should be precluded based on relevancy grounds and because it is likely to confuse and mislead the jury about the appropriate measure of damages allowed by law.

The purpose of this motion is to ensure that only admissible evidence is introduced at trial and, equally important, to ensure that the arguments of Electrolux's counsel are based only on admissible evidence.

## II.  <u>Legal Standard</u>

"An in limine motion is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 707 (E.D. Pa. 2012) (quotations omitted).  "Evidence shall be excluded in limine only when it is

shown that the evidence is inadmissible on all potential grounds." *Speaks v. Mazda Motor Corp.*, 118 F. Supp. 3d 1212, 1217 (D. Mont. 2015).

Under Federal Rule of Evidence 402, "[r]elevant evidence is admissible," unless otherwise provided by law, and "[i]rrelevant evidence is not admissible." Fed. R. Evid. 402. Under Rule 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Fed. R. Evid. 401.

Under Federal Rule of Evidence 403, the court may exclude even relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## III.  Legal Argument

Evidence of the following should be precluded from trial:

### 1.  Evidence of insurance should be precluded because it is irrelevant and prejudicial.

Evidence of insurance has no place in this case because it is irrelevant and prejudicial. As this court has observed, "[t]he law recognizes that the presence of an insurance company on either side of a case may affect a jury's decision on the merits, and consequently the law prohibits even the mention of the fact of insurance in a case if at all possible." *White Hall Bldg. Corp. v. Profexray Division of Litton Industries*, Inc., 387 F.Supp. 1202 (E.D.Pa. 1974); *see also Acme Markets, Inc. v. Shaffer Trucking, Inc.*, 102 F.R.D. 216, 218 (E.D. Pa. 1984); *Stouffer Corp. v. Dow Chem. Co.*, 88 F.R.D. 336, 338 (E.D. Pa. 1980).

Throughout discovery, Electrolux revealed its intent to inject insurance into this case in order to prejudice Allstate in front of the jury. *See, e.g.,* Exhibit A, Letter from Electrolux's

Counsel to Magistrate Judge Heffley (arguing it is entitled to unfettered discovery about Allstate's corporate practices, policies, and procedures); Exhibit B, Electrolux's Requests for Admissions (attempting, again, to gain discovery on Allstate's corporate practices, policies, and procedures even after both the Magistrate Judge and District Court ruled that such matters were irrelevant and non-discoverable).   This is a known litigation tactic for Electrolux, as evidenced by the following opening statement it made at trial in 2012.

> And back in 2006, Julie Newcomb bought a dryer. At the same time, she bought a house, shortly thereafter, and purchased homeowner's insurance from the Travelers. A few months after moving into her house, her dryer caught fire, which you have heard we have agreed that that happened.
>
> What happened then is that her damages to her property were paid and now Travelers wants their money back. They got their premium and they made the payment that they are supposed to under the contract, and now they want their money back. And that's why we are here, to answer the question that was asked.

Exhibit C, Trial Transcript, *Standard Fire Insurance v. Electrolux*, 8-cv-540, Feb. 22, 2012, at 50:2-14.  Electrolux wants to play off the greedy insurance company trope and argue to the jury that Allstate has somehow developed a "profit strategy" from dryer fire litigation against Electrolux.  *See, e.g.,* Exhibit D, Electrolux's Response to Allstate's Motion for Protective Order in South Carolina Consolidated Action, at 7; Exhibit E, Electrolux's Response to Allstate's Motion for Protective Order in Hubbert Claim, at 20.

The fact that Allstate is subrogated to the rights of its insureds' claims is irrelevant because it has no tendency to make any fact of consequence in the action more or less probable than it would be without the evidence.  *See* Fed. R. Evid. 401. To be sure, proof of an insuring agreement or contractual indemnity payments are not elements of any of the claims or defenses asserted in this case. "Subrogation is allowed in favor of an insurer who pays a loss suffered by its insured which was occasioned by the negligence of a third party.  Subrogation thus arises by

operation of law and there is no need for the contract of insurance to contain an express stipulation as to subrogation." *Turner Const. Co. v. John B. Kelly Co.*, 442 F.Supp. 551, 552-553 (E.D. Pa. 1976) (citing *Roberts v. Fireman's Ins. Co.*, 376 Pa. 99, 101 A.2d 747 (1953); *Fidelity Title and Trust Co. v. People's Natural Gas Co.*, 150 Pa. 8, 24 A. 339 (1892)).

Even if some relevant purpose could be articulated, its probative value is substantially outweighed by the danger of unfair prejudice, jury confusion, delay or waste of time. *See* Fed. R. Evid. 403.

Accordingly, evidence of insurance should be precluded.

**2. Evidence of Compliance with Irrelevant Voluntary Minimum Testing Standards should be precluded because it is irrelevant, prejudicial, and likely to mislead the jury**

Central to Electrolux's defense that its subject dryers were not defective is its argument that the dryers complied with ANSI Z21.5.1 and UL2158. *See, e.g.,* Exhibit F, Electrolux's Expert Report (Almodovar Claim), at 18-22. ANSI Z21.5.1 and UL2158 are voluntary minimum testing standards for gas and electric clothes dryers created by those in the industry.

Any evidence or testimony concerning compliance with these testing standards should be precluded because they are irrelevant to the facts and issues involved in this case. Fed. R. Evid. 401. Allstate contends that Electrolux's ball-hitch dryers are defectively designed because they allow combustible lint to migrate during the drying cycle into an inaccessible space and become ignited by an ignition source. Then, once ignited, the dryers are unable to effectively contain a fire to the dryers' cabinet. When the subject dryers were manufactured, ANSI Z21.5.1 and UL2158 did not require dryers to be tested for their ability to safely manage internal lint accumulation or to contain fires within the cabinet. *See* Exhibit G, Michael Stoddard Report, at 139. Thus, compliance with ANSI Z21.5.1 and UL2158 do not speak to any standard with

respect to the defects at issue.

Moreover, even if there were specific relevant testing standards, evidence that the subject dryers met their requirements is inadmissible to prove that the product was not defectively designed under Pennsylvania law. *See Lewis v. Coffing Hoist Div., Duff-Norton Co.*, 515 Pa. 334, 343, 528 (Pa. 1987); *Dunlap v. Fed. Signal Corp.*, 194 A.3d 1067, 1072 (Pa. Super. 2018); *Webb v. Volvo Cars of N. Am., LLC*, 148 A.3d 473, 483 (Pa. Super. 2016); *Harsh v. Petroll*, 840 A.2d 404, 425 (Pa. Commw. Ct. 2003), *aff'd*, 584 Pa. 606, 887 A.2d 209 (2005); *Gaudio v. Ford Motor Co.*, 976 A.2d 524, 543-44 (Pa. Super. 2009) (collecting cases). Even the testing standards themselves state that compliance does not mean that a product is safe or non-defective. *See* Exhibit G, Michael Stoddard Report, at 139. Evidence of compliance, therefore, does not make any fact of consequence more or less probable and should be precluded for that reason alone. Fed. R. Evid. 401.

Evidence of compliance with these voluntary minimum testing standards should also be precluded under Rule 403. There is a substantial possibility that a jury could be misled and wrongfully infer that compliance with these standards is evidence that the product is not defective, prejudicing Allstate.

### 3. Evidence of Government Inaction should be precluded because it is irrelevant, prejudicial, likely to mislead the jury, and will unnecessarily elongate trial.

Electrolux intends to present evidence that the United States' Consumer Product Safety Commission ("CPSC") and Japan's Ministry of Economics, Trade and Industry ("METI") took no formal action against it despite complaints about the subject dryers defective design. Electrolux seeks to introduce this evidence to bolster its claim that its products are not defective and that its conduct was not negligent. To be clear, neither the CPSC nor METI ever concluded

that Electrolux's ball-hitch dryers were safe for use or were not defective.  Rather, for reasons unknown to either party, both agencies decided not to pursue any action.

This evidence should be precluded because it is irrelevant.  The CPSC is not required by law to take any action with respect to every defective product. For this reason, the CPSC's enabling Act states the following:

> The failure of the [Consumer Product Safety] Commission to take any action or commence a proceeding with respect to the safety of a consumer product shall not be admissible in evidence in litigation at common law or under State statutory law relating to such consumer product.

15 U.S.C. § 2074(b).  Similarly, there is no evidence that METI is required to take any action, nor is there any evidence about the basis for their decision or the standards it utilized.  Evidence that the CPSC or METI declined to take action against Electrolux, therefore, is not probative of whether the dryer was defectively designed or not under Pennsylvania law even if they had definitively concluded its investigation and cleared Electrolux of any wrongdoing (which has not occurred).

Moreover, evidence of agency inaction should be precluded because it is prejudicial to Allstate and misleading to the jury to introduce such evidence and argument in light of the paltry factual record about the agencies' decisions.  Fed. R. Evid. 403.  The danger of unfair prejudice – that is, that a jury may speculate that inaction by an agency in this setting is tantamount to the United States or Japanese government's approval of the allegedly defective dryer in the face of such administrative agency inaction – is great and substantially outweighs the evidence's probative value.  Electrolux's refusal to disclose complete records of its interaction with those government entities renders any "inaction" meaningless.  There is no way for the jury to know whether Electrolux provided complete information to government investigators or otherwise fully cooperated with any government investigation as obligated by law.  Introduction of

evidence about government inaction would also lead to a trial within a trial about whether those bodies conducted a proper review, whether those bodies applied the laws correctly and whether, if at all, the laws, rules and regulations that were applied are similar or dissimilar to the strict products liability and negligence laws of Pennsylvania.

Pursuant to Federal Rules of Evidence 401 and 403, therefore, Electrolux should be precluded from offering evidence at trial about any CPSC or METI inaction with respect to the subject dryers or otherwise arguing or inferring that such inaction proves the "non-defective" condition of the subject dryers.

## 4.    Evidence of Fires in Dryers Manufactured by Unknown Manufacturers or Manufacturers other than Electrolux should be precluded because it is irrelevant, prejudicial, and misleading.

Electrolux regularly touts statistics collected from various sources, including the National Fire Protection Association ("NFPA"), United States Fire Administration ("USFA") and Underwriters Laboratories ("UL") in different manners as evidence that its dryers are safe. The data underlying these statistics all share the same source, which is not reliable. These statistics and any opinions that flow from them, therefore, should be precluded under Rules 401 and 403.  At best, these statistics prove nothing. At worst, they are downright misleading.

The data relied upon by the NFPA, USFA and UL is flawed.  Two district courts have already made such a determination and ruled that opinions that flowed from it are inadmissible. *See State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1038 (N.D. Ind. 2013); *State Farm Fire & Cas. Co. v. Electrolux N. Am.*, No. 2:10-CV-01147 RSM, 2012 WL 161821, at *4 (W.D. Wash. Jan. 4, 2012).  Electrolux's experts admit that they have no idea how the data from these sources was compiled, but rely on it anyway.  Exhibit H, Ken Garside Dep. Tr. Aug. 2, 2018, at 201-205 (to be filed under seal).

The data is compiled from the National Fire Incident Reporting System ("NFIRS").  *See, e.g.,* Exhibit I, Richard Campbell, NFPA – Home Fires Involving Clothes Dryers and Washing Machines (2017), at Appendix A.  Data from NFIRS is collected by voluntary participation of municipal fire departments in a standardized survey.  To input data into the NFIRS system, the participating volunteers must identify, among other things,  a fire's "area of origin", "item first ignited", "factors contributing to ignition", "cause of ignition", "heat source", and "equipment involved in ignition" and input this data by choosing the correct or most applicable code to categorize the data.  In the event of a dryer fire, there is no method to input data about the dryers' manufacturer.

Several issues affecting the data's reliability arise precluding one from drawing any sort of reliable conclusions from it.  First, the reliability of the data is entirely dependent on the skill, experience, and ability of unknown participants to correctly determine that a fire was in fact a dryer fire.  The NFIRS data is not reliable because there are no standards governing (or any information about) *who* is inputting the data.  Professional fire investigators spend years gaining the requisite knowledge, experience, and training to be able to correctly identify a fire's area of origin, item first ignited, cause of ignition, etc.  There are no requirements (or method to ensure) that those entering fire incident data from participating municipal fire departments have the necessary background, knowledge, or experience to correctly make such determinations and correctly enter them into the NFIRS system.

The volunteer's affiliation with a municipal fire department is not an indicia of reliability.  Experience fighting fires is not indicative of experience investigating the cause or origin of fires.  Fire Suppression and Overhaul is an entirely different scientific field than Fire Cause and Origin investigations.  While some (but not all) municipalities employ designated

Fire Marshals, Fire Marshals are not necessarily required to have any background or training in fire cause and origin determinations. And in any event, even if there is an experienced and trained Fire Marshal capable of making a correct determination in a participating municipality, there is no evidence that the Fire Marshal is actually making the determination that is incorporated into the NFIRS data. Second, the NFIRS data is unreliable because it only accounts for participating municipal fire departments. It does not account for fires reported to other types of agencies or fires reported to non-participating municipal fire departments.

Accordingly, the data compiled by NFIRS is not reliable from which to draw any sort of conclusion. Nonetheless, Electrolux uses this data to make a number of misleading contentions that each suffer from additional problems affecting their reliability.

First, Electrolux uses NFIRS data as proof of its contention that Electrolux's ball-hitch dryers are actually *more safe* than dryers manufactured by others. *See, e.g.,* Exhibit F, Electrolux's Expert Report (Almodovar Claim), at 42-45. To accomplish this, Electrolux relies on NFIRS data as a basis for the overall number of dryer fires that occur in a given year and compares that number to the number of dryer fires annually reported directly to Electrolux. Per Electrolux's calculation (based on these two unrelated and flawed sets of data) the amount of dryer fires in Electrolux ball-hitch dryers is allegedly less than anticipated in terms of Electrolux's percentage of the overall market share.

In addition to the data from NFIRS being flawed, Electrolux's own internal data about the number of reported ball-hitch dryer fires is likewise flawed. Electrolux "ball-hitch" dryers often go unreported to Electrolux for various reasons. For example, a fire may have caused very little property damage and the victim or her insurer determined that submitting a claim to Electrolux – notorious for its "war of attrition" litigation tactics – would be more expensive than

the claim was worth and therefore refrained from reporting the fire to Electrolux.  By way of another example, a fire may have been too destructive and the fire damage prevented investigators from identifying the manufacturer.  Accordingly, because both data sets are flawed, Electrolux's conclusion that its dryers are safer than those of other manufacturers is irrelevant and misleading.

Additionally, Electrolux relies on statistics founded on NFIRS data to state that the "leading factor" contributing to the ignition of residential fires involving dryers was "the failure to clean."  *See* Exhibit I, Richard Campbell, NFPA – Home Fires Involving Clothes Dryers and Washing Machines (2017), at 6.  Electrolux should be precluded from parroting this statement. In addition to the limitations discussed above, the author of the statement admits that there is a substantial possibility of double counting.  *See* Exhibit I, Richard Campbell, NFPA – Home Fires Involving Clothes Dryers and Washing Machines (2017), at Appendix B.  Additionally, the author's term "failure to clean" is not defined.  There is no data concerning what the dryer user or homeowner allegedly failed to clean that allegedly caused the fires.  Such disparate areas could include the areas around the base of the dryer, the lint trap, the dryer's venting, or the interior of the cabinet.  Because "failure to clean" is not defined, it cannot provide any insight into the actual cause of the fire and would not help the jury draw any conclusion as to a link between consumer behavior and dryer fires.

Finally, Electrolux uses statistics based on NFIRS data to argue that fires from lint accumulation pose a hazard in all dryers regardless of design style or manufacturer.  *See, e.g.,* Exhibit H, Ken Garside Dep. Tr. Aug. 2, 2018, at 201-205 (to be filed under seal).  Simply put, there is no basis to draw this argument.  The NFIRS system does not collect any data regarding the manufacturer of an alleged dryer fire that is entered into its system.  For all Electrolux or

anyone else knows, every single dryer fire entered into the NFIRS system stems from an Electrolux ball-hitch dryer.  The data, therefore, does not warrant the conclusion that the risk related to lint accumulation dryer fires is equal in all dryer brands and/or designs.

Accordingly, any evidence of conclusion that is based on data obtained from NFIRS is unreliable, irrelevant, and will only serve to mislead the jury about the rate of dryer fires.

5.     **Peter Silman should be precluded from testifying at the time of trial because he lacks personal knowledge and has not been identified as a testifying expert.**

Peter Silman appeared on behalf of Electrolux as its Rule 30(b)(6) corporate designee witness for deposition.  Mr. Silman should be precluded from testifying at trial because he has no relevant personal knowledge of any fact or event at issue in this case.

Federal Rule of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602. "[Rule 602's] purpose is to assure reliability."  *U.S. ex rel. El-Amin v. George Washington Univ.*, 533 F. Supp. 2d 12, 25 (D.D.C. 2008) (citing *United States v. Lemire,* 232 U.S.App. D.C. 100, 720 F.2d 1327, 1347 (D.C.Cir.1983)).  Similarly, under Federal Rule of Evidence 701, a non-expert witness may only offer an opinion that is "rationally based on the witness's perception[.]"  Fed. R. Evid. 701.

Mr. Silman has been the "Product Safety Engineer" for the "Laundry Division" of the "Major Appliance" Unit at Electrolux since only July of 2014 or 2015.  *See* Exhibit J, Peter Silman Dep. Tr., at 15-20, 28.[1]  Mr. Silman had no prior work experience either in the Laundry

---

[1] Portions of the transcript that Electrolux marked as confidential pursuant to the parties' Stipulated Protective Order have been redacted. ECF No. 32.

Division or the Major Appliance Unit prior to that time.

Mr. Silman did not perform any investigation into the subject fires and played no role in their engineering, design, manufacture, or marketing.  He has no personal knowledge of any event of importance in this litigation.  His only source of relevant information is the review of testimony by former employees and documents created by others.

Accordingly, Mr. Silman should be precluded from testifying due to lack of personal knowledge.

**6.     Evidence or Argument about "Depreciation" or "Actual Cash Value" should be precluded because it is irrelevant and prejudicial.**

Electrolux may attempt to introduce evidence of "depreciation" or "actual cash value" ("ACV") from Allstate's first-party claim adjustment in an effort to undermine the value of the Allstate's property damage claims at trial.  Such evidence or argument should be precluded based on relevancy grounds.

Pennsylvania law defines how property damage is calculated in tort actions.  Real property damage capable of being repaired is measured at the cost of restoring it to its pre-loss condition.  See *Pennsylvania Dept. of General Services v. U.S. Mineral Products Co.*, 587 Pa. 236, 246 (2006); *Lobozzo v. Adam Eidemiller, Inc.*, 437 Pa. 360, 369 (1970). Destruction of personal property, on the other hand, is measured at the fair market value of the thing at the time it was destroyed.  *Pennsylvania Dep't of Gen. Servs. v. U.S. Mineral Prod. Co.*, 587 Pa. 236, 272, 898 A.2d 590, 612 (2006); *Daughen v. Fox*, 372 Pa. Super. 405, 418, 539 A.2d 858, 864 (1988).

Allstate adjusted its insureds' property damage claims pursuant to the terms and conditions of their insurance policies, which are not at issue in this case.  Allstate concedes

certain information from Allstate's adjustment may be relevant and otherwise admissible.  For example, an item's replacement cost might be relevant to the extent it bears on the item's fair market value at the time of the fire according to witnesses competent to value property damage.

However, "depreciation" and "ACV" have no bearing on the measure of property damage under Pennsylvania law.  Regarding the damages to real property, the measure is the restoration cost.

Meanwhile, personal property damage is measured by fair market value at the time of the fire.  Fair market value is the price a willing buyer would pay a willing seller for an item in a free market.  Fair market value is not calculated by deducting "depreciation" from the item's replacement cost, which is how "ACV" is determined by property insurers such as Allstate while adjusting first-party property damage claims.

Any conceivable relevancy is substantially outweighed by the danger of misleading, distracting and/or otherwise confusing the jury, especially because the court will instruct the jury to calculate the property damage claims differently than Allstate calculated its indemnity payments.  Such evidence should therefore be precluded pursuant to Federal Rule of Evidence 403 even if Electrolux conceives of some way "depreciation" or "ACV" calculated by Allstate during its claim adjustment makes any fact of consequence in this case more or less likely.

Accordingly, any evidence of depreciation or "ACV" should be precluded.

**IV.**     <u>**Conclusion**</u>

For the reasons stated above, the following evidence and argument should be precluded

from trial:

1) Evidence of Insurance;
2) Evidence of Compliance with Irrelevant Voluntary Minimum Testing Standards;
3) Evidence of Government Inaction;
4) Evidence of Fires in Dryers Manufactured by Unknown Manufacturers or Manufacturers other than Electrolux;
5) Trial Testimony of Peter Silman;
6) Evidence of "Depreciation" or "Actual Cash Value."


Respectfully submitted,


**de LUCA LEVINE, LLC**


BY:   <u>Raymond E. Mack</u>

RAYMOND E. MACK, ESQUIRE
P.A. ID No. 91815
rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
P.A. ID No. 91415
phughes@delucalevine.com
Three Valley Square, Suite 220
Blue Bell, PA  19422
215-383-0081 (Main) / 215-3383-0082 (fax)
ATTORNEYS FOR PLAINTIFFS

## CERTIFICATE OF SERVICE

I, Raymond E. Mack, Esquire, hereby certify that a true and correct copy of Plaintiffs' Omnibus Motion in Limine to Preclude Certain Evidence was served upon all counsel of record on January 8, 2018 by ECF filing.

de LUCA LEVINE, LLC

BY: Raymond E. Mack

RAYMOND E. MACK, ESQUIRE
P.A. ID No. 91815 rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
P.A. ID No. 91415 phughes@delucalevine.com
Three Valley Square, Suite 220
Blue Bell, PA  19422
215-383-0081 (Main) / 215-383-0082 (fax)
ATTORNEYS FOR PLAINTIFFS