## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY, and ALLSTATE VEHICLE & PROPERTY INSURANCE COMPANY,**<br><br>          **Plaintiffs**<br>     **v.**<br><br>**ELECTROLUX HOME PRODUCTS, INC.**<br><br>          **Defendant** | **Case No.: 16-cv-04276 EGS** |

## PLAINTIFFS' OMNIBUS MOTION IN LIMINE TO PRECLUDE CERTAIN EXPERT TESTIMONY

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company (hereinafter "Allstate"), by and through their attorneys, submit this Omnibus Motion in Limine to Preclude Certain Evidence in accordance with the scheduling order.

### I.    Introduction and Argument Summary

Briefly, this case involves eight defective Electrolux "ball-hitch" clothes dryers that erupted in flames during normal use and caused property damage paid for by Allstate. Allstate brought this products liability and negligence action against Electrolux seeking awards of compensatory and punitive damages. The specifics regarding the dryers' defective condition and the cause of the damages sustained by Allstate's insureds are discussed in detail in Allstate's Motion to Preclude Certain Evidence and omitted here for brevity.

Electrolux intends to present expert testimony at trial, including from forensic

2

consultants Kenneth Garside ("Garside") and Frank Schwalje ("Schwalje"). Garside's and Schwalje's opinions – which are nearly identical - should be limited in accordance with Rule 702.

Garside and Schwalje are not qualified to testify about their dryer design opinions. Both are career forensic and professional engineers who proclaim to be "experts" in any number of fields. The truth is, however, that both experts are practicing failure analysts and fire investigators. They are principals in their forensic consulting business, Affiliated Engineering, and investigate for clients the role of products and systems in the cause of accidents and fires. They lack the formal or informal education or training in the field of clothes dryer design one would reasonably expect a clothes dryer design expert to possess. Neither expert conducted research to better understand the clothes dryer design process, either in terms of how Electrolux executed that process or how it should have been executed. They know little, if anything, about what safety factors are proper or improper for a clothes dryer manufacturer to consider or ignore during the design and development of a clothes dryer. Despite having unlimited access to their client, neither Garside nor Schwalje asked any questions of Electrolux about the design process, or the process by which Electrolux concluded that it would be safer and cost-effective to build dryers with steel air ducts and steel blower housings rather than combustible plastics. Garside and Schwalje are unfamiliar with the dryer manufacturing industry. They have very little understanding of how a trade association like the Association of Home Appliance Manufacturers ("AHAM") influences the development and implementation of voluntary minimum safety testing standards. Neither expert studied the safety performance of Electrolux's bulkhead dryers versus the safety performance of Electrolux's ball-hitch dryers. They did not perform any experiments to verify Electrolux's ball-hitch design. Garside and Schwalje are not

experts in the particular field of clothes dryer design engineering and should be precluded from offering related opinions for that reason.

Even if the court somehow finds them qualified, however, Garside's and Schwalje's dryer design opinion testimony should be limited because it is unreliable and not product of work one would expect from an expert in any field. In fact, Garside and Schwalje seem to have invented for purposes of litigation a design standard against which to judge Electrolux's "ball-hitch" dryer. They say that the dryers are not defective because, "As designed [the dryers are] reasonably safe for [their] intended use when installed, operated and maintained in accordance with the manufacturer's instructions."

First, Garside's and Schwalje's "reasonably safe" standard is profoundly and unacceptably subjective. What does "reasonably safe" mean? "Reasonably safe" is not a term of art in the clothes dryer industry. "Reasonably safe" is not a legal term. There are no text books or other literature that define the boundaries of "reasonably safe." No objective criteria exist for any factfinder to assess whether Garside and Schwalje accurately applied this "reasonably safe" label.

Second, and particularly troubling, Garside's and Schwalje's invented "reasonably safe" standard directly contradicts Pennsylvania law. In terms of negligence, Electrolux must use ordinary care to build the safest dryer feasible. In terms of strict products liability, Electrolux's ball-hitch dryers are defective if, when sold, they were more dangerous than an ordinary consumer would expect, or if a reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions. Even a "reasonably safe" product may be deemed defective under Pennsylvania law. The subjectivity of this "reasonable safe" standard combined with the fact that it contradicts

Pennsylvania law makes Garside's and Schwalje's design opinions inadmissible.

Garside and Schwalje's causation opinions are also unreliable and inadmissible. Despite both experts failing to conclude with reasonable certainty where within the dryers these fires began or how, Garside and Schwalje conclude certainly that "improper" installation, maintenance or use of the dryers caused lint to accumulate within the dryer cabinet.

Importantly, for their work in this case, Garside and Schwalje were assigned by Electrolux to investigate different fires. They performed their work in the same manner. They systematically and thoroughly examined the post-fire condition of the evidence, which included the remains of the dryers and other components (such as, where available, the transition exhaust duct and premises exhaust vent system), reviewed written materials handpicked by Electrolux and studied the deposition testimony from this case. They performed no experiments. In fact, they have been investigating "ball-hitch" dryer fires for Electrolux for a very long time (Schwalje, for example, has investigated the cause of more than 200 Electrolux ball-hitch dryer fires in the last 20 years) and have never performed a single experiment to test a single hypothesis. Despite access to Electrolux employees and former employees, Garside and Schwalje performed no interviews and asked nobody any questions.

Finally, Mr. Garside and Mr. Schwalje should be precluded from offering the opinions of non-testifying experts previously retained by Electrolux.  Both Mr. Garside and Mr. Schwalje wholesale adopt the expert conclusions and opinions of litigation consultants previously retained by Electrolux to assist in the defense of dryer fire litigation.  They make this adoption without any independent review or consideration of the data the former consultants relied on. Electrolux's experts' reliance on these non-testifying experts' opinions is an improper attempt to shield these unreliable opinions from scrutiny and cross-examination.

Accordingly, Electrolux's experts, Mr. Garside and Mr. Schwalje, should be precluded from offering testimony on topics listed below.

## II.   **Legal Standard**

Under Federal Rule of Evidence 702, "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

This rule has been interpreted to require the proponent of an expert to show that the expert is: (1) qualified to give an expert opinion, (2) the opinion given is based on a reliable method, and (3) the opinion offered fits, *i.e.*, is relevant to the case at bar. *See, e.g., Elcock v. Kmart Corp.,* 233 F.3d 734, 741 (3d Cir.2000); *see also Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999).

To qualify as an expert witness, the witness must have specialized knowledge in the area of testimony resulting from knowledge, skill, experience, training, or education. *See, e.g., Curry v. Royal Oak Enterprises, LLC*, No. CIV.A. 11-5527, 2013 WL 3196390, at *2 (E.D. Pa. June 25, 2013).

"When the expert testifies to scientific knowledge, the expert's opinions must be based on the methods and procedures of science rather than on subjective belief or unsupported

speculation; the expert must have good grounds for his or her belief." *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 325 (E.D. Pa. 2015) (*quoting In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 742 (3d Cir.1994) (*quoting Daubert,* 509 U.S. at 590, 113 S.Ct. 2786))) (quotations omitted).  "Although *Daubert* does not require a paradigm of scientific inquiry as a condition precedent to admitting expert testimony, it does require more than the haphazard, intuitive inquiry . . . ." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 156 (3d Cir. 2000).  An expert's opinions must be based on more than "just the *ipse dixit* of the expert." *Pappas v. Sony Elecs., Inc.*, 136 F. Supp. 2d 413, 426 (W.D. Pa. 2000).

The proffered testimony must assist the trier of fact in resolving an issue relevant to the case to satisfy the "fit" requirement.  *See, e.g., Oddi,* 234 F.3d at 145 (3d Cir.2000); *In re Paoli,* 35 F.3d at 743.  For an opinion to "fit" the case, there must be a connection between "the scientific research or test result to be presented and particular disputed factual issues in the case." *Oddi,* 234 F.3d at 145.  "Expert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Yazdani v. BMW of N. Am., LLC*, No. CV 15-01427, 2016 WL 2755589, at *5 (E.D. Pa. May 12, 2016) (quoting *Daubert*, 509 U.S. at 591.

## III.   <u>Legal Argument</u>

The following evidence and/or arguments should be precluded from trial:

### 1.   **Testimony about Dryer Design Processes or Safety Monitoring.**

Electrolux's experts should be precluded to the extent they hold any opinion related to the propriety of Electrolux's design process and the monitoring of its dryers for safety issues. In other words, Electrolux's experts should be barred from testifying that Electrolux met the standard of care during the design process and did not need to recall its dryers after receiving thousands of reports of fires.

Mr. Garside and Mr. Schwalje are both mechanical engineers with experience in forensic failure analysis and fire investigations.  *See* Exhibit A, Kenneth Garside CV; Exhibit B, Frank Schwalje CV.  They are principals in their forensic consulting business, Affiliated Engineering, and investigate for clients the role of products and systems in the cause of accidents and fires. In this capacity, they are qualified to render opinions on the potential failure modes of the subject dryers and the cause of the subject fires.  Though mechanical engineers may be able to acquire experience and knowledge related to dryer design and manufacture processes, they did not do so here other than to review documents handpicked by their client.

They are not experts in the field of dryer design and manufacture processes.  *See,* Exhibit A, Kenneth Garside CV; Exhibit B, Frank Schwalje CV; *see also* Exhibit C, Ken Garside Dep. Tr. Aug. 2, 2018, at 41-43, 235-236 (to be filed under seal); Exhibit D, Frank Schwalje Dep. Tr., at 93 (to be filed under seal).

They know very little about the history of the dryer industry and dryer designs, or any standards employed by the industry.  For example, Mr. Schwalje (and Mr. Garside, as well) opines that Electrolux was not required to perform any fire containment testing until fire containment testing standards were adopted by voluntary minimum testing standard UL2158. Exhibit D, Frank Schwalje Dep. Tr., at 103.  He does not, however, have any knowledge about any other testing performed or standards utilized by other dryer manufacturers prior to the enactment of the UL2158 fire containment testing standard.  Exhibit D, Frank Schwalje Dep. Tr., at 103-106.  They further have very little understanding of manufacturers like Electrolux's role in the Association of Home Appliance Manufacturers ("AHAM") and the association's influences over the development and implementation of voluntary minimum safety testing standards.  *See* Exhibit E, Ken Garside Dep. Tr. Oct. 17, 2018, at 8-11 (to be filed under seal);

Exhibit D, Frank Schwalje Dep. Tr., at 114-115.

Nor did Mr. Garside or Mr. Schwalje make any attempt to learn about Electrolux's design process to see if it was appropriate or not.  The parties agree that the "hierarchy of safe engineering and design" is the standard of care for the manufacturer of a consumer product. Under this standard, when a hazard related to a consumer product is identified, a manufacturer is to, first, attempt to design out the hazard.  Second, if the hazard cannot be designed out, the manufacturer should guard against the hazard.  Finally, as a last resort if the hazard cannot be designed out or guarded against, the manufacturer can address the hazard by relying on instructions or literature to warn the user of the hazard and the steps necessary to avoid the hazard.  *See* Exhibit F, Report of William Vigilante, at 25-34 (Plaintiffs' Expert); Exhibit G, Report of J.P. Purswell in Weiss Claim, at 4 (Electrolux's expert).

One of Allstate's primary contentions is that Electrolux violated its standard of care because it should have incorporated alternative designs to "design out" the hazards related to lint accumulation and fire containment.  Specifically, Electrolux should have incorporated a bulkhead design to prevent lint from accumulating near known ignition sources and steel component parts to eliminate fuel sources for fires.

However, though Mr. Garside and Mr. Schwalje were aware of this standard of care, neither reviewed or requested any documents related to Electrolux's consideration of the fire hazard related to the accumulation of lint and its ability to contain a fire for its ball-hitch dryers and how the hazard could be reduced, mitigated, or eliminated through the engineering process or design changes.  Exhibit C, Ken Garside Dep. Tr. Aug. 2, 2018, at 127-128; Exhibit D Frank Schwalje Dep. Tr., at 110-112.  Further, Electrolux's experts did not undertake any analysis to compare the rate of dryer fire incidents between ball-hitch dryers and a bulkhead dryer and,

therefore, do not know whether the lint accumulation hazard could have been designed out. Exhibit C, Ken Garside Dep. Tr. Aug. 2, 2018, at 218-222.   Similarly, they performed no analysis with respect to whether metal component parts would perform better in a fire.   Exhibit C, Ken Garside Dep. Tr. Aug. 2, 2018, at 254.

Without this knowledge, there is no way that they can say that Electrolux was unable to design out the hazard and therefore that Electrolux complied with the standard of care for a dryer manufacturer.   Accordingly, Electrolux's experts should be precluded from offering any opinions on the propriety of Electrolux's dryer design process.

### 2.   Reference to Subjective "Reasonably Safe" Design Standard.

Electrolux's experts should precluded from testifying that the subject dryers met the "Reasonably Safe" design standard which they have invented solely for purposes of defending Electrolux in its dryer fire litigation.   This subjective standard is irrelevant to determining whether a product is defective under Pennsylvania law, does not help the jury understand any fact or issue in the case, and is prejudicial because it will likely mislead and confuse the jury about the standard upon which they are to actually judge the design of the dryers.

In each report related to the eight fires, Electrolux's experts opine that: "As designed this dryer was reasonably safe for its intended use when installed, operated and maintained in accordance with the manufacturer's instructions."   The reports go on to list the "basis" for this standard – which is clearly handpicked by Electrolux and its attorneys to satisfy this made up standard.[1]   When pressed for the origin of this "standard", Electrolux's expert was unable to

---

[1] *See* Exhibit H, EHP Almodovar Report, at 54, 110-112; Exhibit I, EHP Bullene Report, at 56, 117-119; Exhibit J, EHP Christie Report, at 54, 109-111; Exhibit K, EHP Gray Report, at 53, 107-109; Exhibit L, EHP Gutierrez Report, at 48, 106-108; Exhibit M, EHP Quinn Report, at 51, 94-96; Exhibit N, EHP Venbrux Report, at 50, 124-126; Exhibit O, EHP Weiss Report, at

point to any authority from which it is based.  Exhibit C, Ken Garside Dep. Tr. Aug. 2, 2018, at 113-116.

Pursuant to Pennsylvania product liability law, the dryers are defective if they were sold in a "defective condition unreasonably dangerous to the consumer." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 383 (Pa. 2014). Products that are determined to be "unacceptable to the average or ordinary consumer" (Consumer Expectation Test), *id.* at 387, or that a "reasonable person would conclude that the probability and seriousness of harm caused by the product outweigh the burden or costs of taking precautions [to alleviate the dangerous condition]" (Risk Utility Analysis). *Id.* at 389.

Electrolux's "Reasonably Safe" standard is irrelevant to the determination of whether a product was "unreasonably defective" under Pennsylvania law.  For one, Electrolux's standard is premised on installation, operation, and maintenance of the dryer in perfect accordance with its product literature.  In contrast, in Pennsylvania, a product manufacturer is liable for damages caused by all foreseeable uses and misuses of its product.  *See Reott v. Asia Trend, Inc.*, 55 A.3d 1088, 1096 (Pa. 2012); *Suchomajcz v. Hummel Chem. Co., Newark, New Jersey*, 524 F.2d 19, 28 (3d Cir. 1975).  Additionally, Electrolux's standard is based almost entirely on its view that its dryers complied with voluntary minimum testing standards like ANSI and UL.  In contrast, these testing standards are irrelevant to the determination of whether a product is unreasonably dangerous and evidence of compliance with these testing standards is inadmissible in a Pennsylvania product inability action.  *See, e.g., Dunlap v. Fed. Signal Corp.*, 194 A.3d 1067, 1072 (Pa. Super. 2018).  Thus, Electrolux's "Reasonably Safe" standard is irrelevant to the determination of whether the dryers are "unreasonably dangerous" under Pennsylvania law.

---

54, 114-116.

Additionally, Electrolux's "Reasonably Safe" standard is highly likely to confuse and mislead the jury.  Electrolux quite clearly chose the wording of its "Reasonably Safe" standard to be a foil to Pennsylvania's "unreasonably dangerous" standard.  By coopting this language to create a new subjective standard that is divorced from its intended meaning and infused with irrelevant information, Electrolux will likely confuse and mislead the jury about the proper standard upon which they will determine whether the subject dryers are defective.

Because this subjective standard is irrelevant and misleading, it will not "help the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  Accordingly, the Court should preclude Electrolux's experts from opining that the dryers are "reasonably safe."

### 3. Testimony about the Cause of these Dryer Fires.

In each case, Electrolux's experts agree that these fires were likely caused by the ignition of "excessive" or "abnormal" lint accumulation in the dryers' cabinet.[2]  Despite being retained to offer analysis into the cause of the fire, they make no effort to provide an opinion on the cause of the fire with any scientific certainty.  They also make no effort to identify the fire sequence involving the next materials ignited.

Further, in each case, Electrolux's experts conclude that the cause of this excessive or abnormal lint accumulation was solely the result of improper installation, use, or maintenance of the dryers that they contend reduced airflow in the dryer.  Electrolux's experts should be precluded from testifying about the specific cause of any pre-fire airflow reduction because their

---

[2] Exhibit H, EHP Almodovar Report, at 53; Exhibit I, EHP Bullene Report, at 56; Exhibit J, EHP Christie Report, at 54-55; Exhibit K, EHP Gray Report, at 52; Exhibit L, EHP Gutierrez Report, at 47-48; Exhibit M, EHP Quinn Report, at 50; Exhibit N, EHP Venbrux Report, at 49; Exhibit O, EHP Weiss Report, at 53.

reports fail to disclose a proper basis for such testimony.  Electrolux's experts neither performed nor reviewed any testing that can show improper installation, use, or maintenance causes of reduces airflow in a dryer in a greater amount or to the exclusion of any unrelated potential causes.

Electrolux's experts acknowledge that the production of lint and reduction of airflow within a dryer is caused by a number of complex and competing factors *unrelated* to the installation, use, or maintenance of a dryer in contravention to manufacturer instructions.  These factors include the size and content of the load, leakage from faulty seals, and lint or other residue that accumulates on the lint screen during the drying cycle.  *See, e.g.,* Exhibit I, EHP Bullene Report, at 41-42; Exhibit D, Frank Schwalje Dep. Tr., at 44-46.  Electrolux's experts admit that "the specific contribution of each of the factors to the specific lint accumulation in this case cannot be definitively determined."  Exhibit I, EHP Bullene Report, at 42.

Nonetheless, without any identifiable basis, Electrolux's experts conclude that improper installation, use, and maintenance was the sole cause of lint accumulation and airflow reduction in each case.[3]  They do so without any basis.

For example, Mr. Schwalje admits a compromised front drum seal can cause a decrease in airflow throughout the dryer.  Exhibit D, Frank Schwalje Dep. Tr., at 54.  He further acknowledges that Electrolux has admitted it has had issues with its front drum seals in its dryers and has published documents admitting that its faulty front drum seals can decease airflow through the dryer.  Exhibit D, Frank Schwalje Dep. Tr., at 52.

---

[3] Exhibit H, EHP Almodovar Report, at 53; Exhibit I, EHP Bullene Report, at 56; Exhibit J, EHP Christie Report, at 54-55; Exhibit K, EHP Gray Report, at 52; Exhibit L, EHP Gutierrez Report, at 47-48; Exhibit M, EHP Quinn Report, at 50; Exhibit N, EHP Venbrux Report, at 49; Exhibit O, EHP Weiss Report, at 53.

In the Christie claim, he admits that the front drum seal was replaced at some point during the course of the dryer's history, indicating there was an issue with it. Exhibit D, Frank Schwalje Dep. Tr., at 76. Mr. Schwalje also admits that he has no evidence about the condition of the front drum seal in the Christie's dryer prior to the fire. Exhibit D, Frank Schwalje Dep. Tr., at 76-77.

Nonetheless, Mr. Schwalje states that he can rule out a faulty front drum seal as a potential cause of reduced airflow in the dryer. Exhibit D, Frank Schwalje Dep. Tr., at 77. This opinion clearly ignores all the evidence that a faulty front drum seal did cause a reduction in airflow throughout the dryer. This evidence includes testimony from the Christies that clothing routinely got stuck in the dryer that was corroborated by physical evidence of clothing materials found in the cabinet. Exhibit P, Plaintiffs' Christie Report, at 37-39. Mr. Schwalje's conclusion was clearly reached long prior to having performed any sort of physical analysis of the dryers themselves or a review of any deposition transcript of Allstate's insureds. *See, e.g.,* Exhibit D, Frank Schwalje Dep. Tr., at 6-8.

All of Electrolux's expert opinions related to the cause of reduced airflow in the subject dryers suffer from this same failure to properly rule out other possible causes. This renders their opinions unreliable and inadmissible.

Practically identical testimony was limited by a district court more than eight years ago in a substantially similar dryer fire case because the testimony lacked a reliable basis. *Auto. Ins. Co. of Hartford v. Electrolux Home Prod., Inc.*, No. 08-CV-00623 (A)(M), 2010 WL 3655743, at *6 (W.D.N.Y. Sept. 15, 2010). Very similar to their opinions here, Electrolux's expert opined in *Demrick* that "severely restricted" airflow "[c]aused an excessive accumulation of lint that ignited within the dryer." *Id.* at 1,

Just as Electrolux's experts must do here, the expert in *Demrick* admitted that he could not identify the fire's ignition sequence, his characterization of the lint accumulation observed post-fire is subjective and based on experience, he is unable to quantify the airflow through the system prior to the fire, there exists many causes of airflow restriction other than the failure to install, use, or maintain the dryer in accordance with manufacturer's instructions, and he had neither conducted nor reviewed the results of any lint accumulation that replicated the conditions of the subject homes. *Demrick*, 2010 WL 3655743, at 1-3.

In *Demrick*, upon plaintiff's motion to limit the testimony of Electrolux's expert, the district court drew a distinction between general and specific causation and denied the motion in part without prejudice to the extent it sought to preclude testimony about the cause of reduced airflow or fires generally. *Id.* at 5-6. However, the court granted the motion and precluded Electrolux's expert from testifying about the specific cause of reduced airflow experienced by Mrs. Demrick's dryer and the specific cause of Mrs. Demrick's fire because the expert's opinions lacked a reliable basis. *Id.* at 6. The court preclude Electrolux's expert from testifying about the specific cause of reduced airflow and lint accumulation because he was unable to rule out or account for any other potential cause. *Id.*

By comparing the testimony precluded by the district court in *Demrick* to the proposed testimony here, it is apparent Electrolux spoon-feeds the same unreliable and incomplete information to whichever engineering consultant is willing to take the money and testify on its behalf. Electrolux's experts rely on exactly the same data and information to form exactly the same opinions as the expert witness whose specific causation opinions were precluded in *Demrick*. Electrolux's experts' testimony should be similarly limited as result.

**4.   Testimony about Opinions of Non-Testifying Experts.**

Electrolux's experts should be precluded from offering the opinions of non-testifying experts previously retained by Electrolux.  Both Mr. Garside and Mr. Schwalje wholesale adopt the expert conclusions and opinions of litigation consultants previously retained by Electrolux to assist in the defense of dryer fire litigation.   These litigation consultants include Trey Morrison, Abid Kemal, Christine Wood, and Thomas Bajzek.   *See* Exhibit Q, Electrolux Reliance Materials, at 2.  Electrolux's experts' reliance on these non-testifying experts' opinions is an improper attempt to shield these unreliable opinions from scrutiny and cross-examination.

"[U]nder some circumstances, an expert may rely on the opinion of another expert. However, 'the rules do not permit an expert to rely upon opinions developed by another expert for purposes of litigation without independent verification of the underlying expert's work.'" *Muhsin v. Pac. Cycle, Inc.*, No. 2010-060, 2012 WL 2062396, at \*4–5 (D.V.I. June 8, 2012) (quoting *Fosmire v. Progressive Max Ins. Co.,* 277 F.R.D. 625, 630 (W.D.Wash.2011)). "Before an expert may rely on the expert opinion of another, the expert must 'assess the validity of the opinions of the expert he relies upon.'" *Id.* (quoting *In re TMI Litig.,* 193 F.3d 613, 716 (3d Cir.1999)). "This is so because Rule 703 contemplates that a testifying expert can 'validate the facts, data and opinions he relied upon during his testimony and be subject to cross-examination on them.'" *Id.* (quoting *In re Imperial Credit Indus., Inc. Secs. Litig.,* 252 F.Supp.2d 1005, 1012 n.5 (C.D.Cal.2003)).   "The ability of a testifying expert to understand and validate the work of an expert upon whom he or she relies is critical to the admissibility of the testifying expert's opinion." *Id.*

Over the many years Electrolux has defended the hundreds of dryer fire lawsuits filed against it, it has employed a number of litigation consultants who have performed various tests

16

and have offered various opinions.  Electrolux's experts improperly adopt these opinions without any independent verification of the facts and/or data upon which the non-testifying experts relied.  For example, Mr. Garside testified that he relied on a report by Mr. Kemal, which purports to show that the incident rate of "thermal events" (not fires) is similar or even higher in bulkhead dryers compared to ball-hitch dryers.  *See* Exhibit R, Kenneth Garside Dep. Tr., Nov. 29, 2018, at 158-159 (to be filed under seal).  Mr. Garside admitted that it is unlikely that he ever reviewed any of the material that Mr. Kemal relied upon to form his opinions. Exhibit R, Kenneth Garside Dep. Tr., Nov. 29, 2018, at 158-159.

Similarly, Electrolux's testifying experts adopt the conclusion of Mr. Bajzek that the temperature needed to scorch or blacken lint is lower than the temperature to ignite lint.  *See, e.g.,* Exhibit I, EHP Bullene Report, at 34.  There is no evidence that either of Electrolux' experts have ever reviewed and assessed the validity of the data used by Mr. Bajzek to reach his conclusions prior to offering their expert opinions here.

By having their testifying experts adopt these non-testifying expert opinions without verification or review of their underlying data, Electrolux is shielding these non-testifying experts from cross-examination and scrutiny.  If permitted, Electrolux's experts will testify, for example, that lint cannot ignite from the heat source behind the dryer drum and that the rate of lint ignition fires is similar in bulkhead dryers compared to ball-hitch dryers, but will be completely unable to testify as to the facts and data that supports such statements.  The jury should be prevented from hearing these baseless conclusions.

This manner of adopting non-testifying experts' opinions is strategic because there is substantial doubt as to the reliability of the data and facts relied upon by these non-testifying experts.  For example, Electrolux's testifying experts rely on Electrolux's former expert,

Christine Wood, who sought to perform a statistical analysis purportedly showing that "the risk of fire in the U.S. involving clothes dryers from any manufacturer is estimated to be over seven times greater than the risk of a reported fire involving Electrolux clothes dryers" and "available data demonstrate that Electrolux clothes dryers do not pose an elevated risk of fire compared with other clothes dryers, and thus are not an unreasonably dangerous product." *State Farm Fire & Cas. Co. v. Electrolux N. Am.*, No. 2:10-CV-01147 RSM, 2012 WL 161821, at *4 (W.D. Wash. Jan. 4, 2012). The data Ms. Wood relied on and the methodology she employed was entirely flawed, resulting in her preclusion by two district courts. *Id.*; *State Farm Fire & Cas. Co. v. Electrolux Home Prod., Inc.*, 980 F. Supp. 2d 1031, 1038 (N.D. Ind. 2013). She has never testified on Electrolux's behalf again. Electrolux's former expert, Mr. Bajzek, upon which its current testifying experts rely, was also precluded after a court found his testimony wholly unreliable. *Auto. Ins. Co. of Hartford v. Electrolux Home Prod., Inc.*, No. 08-CV-00623 (A)(M), 2010 WL 3655743, at *6 (W.D.N.Y. Sept. 15, 2010).

Accordingly, Electrolux's experts should be precluded from parroting the prior opinions of Electrolux's former litigation consultants when they did nothing to assess the validity of the non-testifying experts' opinions and data.

## IV.    Conclusion

For the reasons stated above, the following evidence and argument should be precluded from trial:

1. Testimony about Dryer Design Processes or Safety Monitoring.
2. Reference to Subjective "Reasonably Safe" Design Standard.
3. Testimony about the Cause of these Dryer Fires.
4. Testimony about Opinions of Non-Testifying Experts.

Respectfully submitted,

**de LUCA LEVINE, LLC**

BY:  Raymond E. Mack

RAYMOND E. MACK, ESQUIRE
P.A. ID No. 91815
rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
P.A. ID No. 91415
phughes@delucalevine.com
Three Valley Square, Suite 220
Blue Bell, PA  19422
215-383-0081 (Main) / 215-3383-0082 (fax)
ATTORNEYS FOR PLAINTIFFS

19

## CERTIFICATE OF SERVICE

I, Raymond E. Mack, Esquire, hereby certify that a true and correct copy of Plaintiffs' Omnibus Motion in Limine to Preclude Certain Expert Testimony was served upon all counsel of record on January 8, 2018 by ECF filing.


**de LUCA LEVINE, LLC**


BY: _Raymond E. Mack_

RAYMOND E. MACK, ESQUIRE
P.A. ID No. 91815 rmack@delucalevine.com
PATRICK A. HUGHES, ESQUIRE
P.A. ID No. 91415 phughes@delucalevine.com
Three Valley Square, Suite 220
Blue Bell, PA  19422
215-383-0081 (Main) / 215-383-0082 (fax)
ATTORNEYS FOR PLAINTIFFS