**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY; ALLSTATE VEHICLE & PROPERTY INSURANCE COMPANY<br><br>v.<br><br>ELECTROLUX HOME PRODUCTS, INC. | : NO. 5:16-cv-04276-EGS<br>:<br>:<br>:<br>:<br>:<br>:<br>: JURY TRIAL DEMANDED<br>: |

**DEFENDANT ELECTROLUX HOME PRODUCT INC.'S MEMORANDUM OF LAW
IN SUPPORT OF ITS OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION IN
<u>LIMINE TO PRECLUDE CERTAIN EVIDENCE</u>**

Defendant Electrolux Home Products, Inc. ("Electrolux"), by and through its counsel, Nicolson Law Group LLC, files the within Memorandum of Law in Support of its Opposition to Plaintiffs' Omnibus Motion in Limine to Preclude Certain Evidence. Not one of the requests to limit evidence made by Plaintiffs Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company (collectively, "Allstate") has any merit. Each should be denied. Electrolux respectfully requests oral argument.

**I.   Evidence of insurance is admissible and necessary given Allstate's decision to prosecute these eight individual claims as a consolidated action.**

This case is being prosecuted by a group of insurance companies that were subrogated to the interests of their insureds by virtue of insurance policies. Allstate could have brought these eight claims in the names of the individual insureds, *see Igram v. DESA*, No. 08-1326, 2008 WL 2246428, at *7, n.10 (E.D. Pa. May 30, 2008) (citing Pa. R. Civ. P. 2002(d)), but it chose not to do so. As a consequence, Allstate's name appears in the caption of all of the pleadings and discovery requests in this case. Many of those documents—*e.g.,* discovery responses and

deposition transcripts bearing Allstate's name—have been listed on the parties' exhibit lists for trial.

Further, in its Pretrial Conference Memorandum, Allstate lists 15 different Allstate representatives as potential trial witnesses who will testify on the issue of damages. (*See* Pls.' Pretrial Conf. Memo. (Doc. No. 129) at 9-11.) Indeed, other than custodians of record for unspecified entities involved in property remediation, those 15 Allstate representatives are the only witnesses that Allstate identifies as damages witnesses. (*Id.*) Therefore, Allstate will have to introduce the testimony of those witnesses to prove its claims. Allstate must explain how those witnesses have knowledge of the claims at issue and cannot without affirmatively raising the issue of insurance.

Given these practical hurdles, permitting Allstate to omit any mention of insurance in this matter will render the presentation of evidence confusing and difficult for the jury to comprehend. *See, e.g., Old Chief v. United States*, 519 U.S. 172 189 (1977) ("People who hear a story interrupted by gaps of abstraction may be puzzled at the missing chapters, and jurors asked to rest a momentous decision on the story's truth can feel put upon at being asked to take responsibility knowing that more could be said than they have heard."). As another court in this District recently observed, Allstate's request to omit reference to insurance coverage "casts too wide a net" and the missing pieces that will be caused by that omitting reference to insurance will prejudice Electrolux:

> Plaintiffs will be required to call Allstate employees or contractors as witnesses to prove damages. It is unclear how plaintiffs would establish the purpose of the Allstate employees' testimony without divulging who they are and why they happened to be involved in the case. Moreover, Electrolux would be unable to conduct meaningful cross-examination of any Allstate witnesses were any mention of insurance absolutely prohibited.
>
> I am mindful of the very real possibility of prejudice to plaintiffs should the jury be apprised of Allstate's involvement in this matter,

> as well as the protections against such prejudice afforded by the Pennsylvania Rules of Civil Procedure and the collateral source rule. However, I must also consider the possibility that evidence of insurance may properly be admitted to show bias, prejudice, ownership, or control, along with the potential for jury confusion resulting from the parties' inability to lay a proper foundation for witnesses employed by Allstate.

*Vitale v. Electrolux Home Prods., Inc.*, No. 15-cv-1815, 2018 WL 3868671, at *5 (E.D. Pa. Aug. 14, 2018). In *Vitale*, the court declined to impose the blanket prohibition against any reference to insurance at all. The same result should follow here.

Further, the *Vitale* court's concern that Allstate would be prejudiced by reference to its involvement in that case does not apply here. In *Vitale*, Allstate brought a single claim in the name of its insureds. Allstate sought to exclude reference to insurance coverage in order "to retain the strategic advantage gained by bringing the suit in the name of the insureds rather than in the name of the insurance carrier." *Id*. at *4.

Here, Allstate took a different path. Instead of bringing the eight claims in the name of the relevant insureds, Allstate opted to consolidate the eight claims together into a single complaint with Allstate—in the form of its various iterations that provided the relevant insurance policies—as the named plaintiff. (*See, e.g.,* Compl. (Doc. No. 1).) The decision to forego naming the eight individual insureds as plaintiffs was a purposeful decision intended to ward off challenges to this Court's diversity jurisdiction. During the hearing on Electrolux's early motion to sever and dismiss, Allstate's counsel conceded that Allstate had aggregated these claims into a single complaint with Allstate as the plaintiff to benefit from Rule 18, which permits a party to assert "as many claims as it has against an opposing party":

> The Court:   What about the argument that you're aggregating claims that do not meet the jurisdictional threshold for Federal Court in order to have claims that

|  |  |
|---|---|
|  | rightfully belong in State Court here in Federal Court? |
| Mr. Mack: | Rule 18 addresses that. And it's clear that we're allowed to do that under the rules. I mean, there wouldn't be a rule in place allowing us to—a specific rule allow—we're not trying to come up with some exception to a rule that's in a case somewhere from the Supreme Court in 1932. |
|  | ***This is a rule. And we're just advantaging ourselves of the rule***. |

(Transcript of 9/22/16 Hearing ("9/22/16 Hearing Tr.") (Doc. No. 22) at 29:1-12 (emphasis added).) Indeed, had Allstate asserted the eight separate claims in the names of its individual insureds, the five claims that did not themselves satisfy the amount in controversy requirement for diversity jurisdiction would have been subject to dismissal for lack of subject matter jurisdiction. *See, e.g., Werwinski v. Ford Motor Co.*, 286 F.3d 661, 666 (3d Cir. 2002) ("However, claims of several plaintiffs, if they are separate and distinct, cannot be aggregated for purposes of determining the amount in controversy. Only claims, whether related or unrelated, of a single plaintiff against a single defendant may be aggregated.") (internal citations and quotation marks omitted). Allstate should not be permitted to substitute its insureds' names as the Plaintiffs without reopening an assessment of this Court's jurisdiction and, accordingly, whether the claims can remain consolidated for trial. *See Werwinski*, 286 F.3d at 666.

Allstate cannot hide the fact that it is the plaintiff in this case. The consequences of its decision to proceed as the plaintiff cannot be avoided as references to Allstate must be made at trial for the jury to understand the case, comprehend the role of Allstate's witnesses, and fully assess the facts. Permitting Allstate to abandon its litigation strategy will complicate the proceedings and further delay matters in this case while the Court determines whether it still has

jurisdiction over the claims. Allstate's request to preclude evidence about insurance should therefore be denied.

## II. Evidence that Electrolux complied with voluntary minimum testing standards is relevant to Allstate's negligence and strict liability claims.

Allstate asserts both negligent and strict liability product liability claims. Evidence about compliance with voluntary minimum testing standards bears on both categories of claim. As the court in *Vitale* acknowledged, this evidence is relevant to the issue of negligence because it bears on the reasonableness inquiry that is central to such a claim:

> Evidence presented to show that Electrolux designed the subject dryer in voluntary compliance with contemporaneous industry standards is relevant to show that Electrolux acted reasonably in the design of the subject dryer.

*Vitale*, 2018 WL 3868671 at *2.

Electrolux's compliance with voluntary minimum testing standards is relevant to Allstate's strict liability claims as well. As the *Vitale* court explained, although Pennsylvania courts had previously determined that such evidence was irrelevant to a strict liability claim, *e.g., Lewis v. Coffing Hoist Division, Duff-Norton Co., Inc.*, 528 A.2d 590, 593-94 (Pa. 1987), the Pennsylvania Supreme Court's decision in *Tincher v. Omega Flex, Inc.*, 104 A.3d 328 (Pa. 2014), changed that:

> In [*Tincher*], the Pennsylvania Supreme Court rearticulated the principles governing products liability actions in Pennsylvania state courts. *Tincher* permits an examination of a manufacturer's conduct and reasonableness during the design of a product in determining whether liability attaches in a products liability context. The holding in *Tincher* blurred the bright line demarcation between negligence theories and strict products liability theories, "counsel[ing] in favor of [the] admissibility" of evidence of compliance with industry standards to defend against strict liability claims.

*Vitale*, 2018 WL 3868671 at *3 (quoting *Rapchak v. Haldex Brake Prod. Corp.*, No. 2:13-CV-1307, 2016 WL 3752908, at *3 (W.D. Pa. July 14, 2016)). In *Vitale*, the court denied Allstate's

motion to exclude evidence about compliance with voluntary minimum testing standards. *Id.* ("In light of *Tincher*, and given that the Vitales assert both negligence and strict liability theories, plaintiffs' motion to preclude introduction of compliance with contemporaneous industry standards is denied."); *see also Cloud v. Electrolux Home Prods., Inc.*, No. 15-00571, 2017 WL 3835602, at *2 (E.D. Pa. Jan. 26, 2017) ("After *Tincher*, courts should not draw a bright line between negligence theories and strict liability theories regarding evidence of industry standards. This evidence of course is not dispositive, but it is relevant and probative given the post hoc evaluation of a manufacturer's conduct that *Tincher* invites, even in strict liability cases.").

The same result follows here. In this case, as in *Vitale*, Allstate asserts both negligence and strict liability claims. Evidence about compliance with voluntary minimum testing standards is relevant to Electrolux's "conduct and reasonableness during the design of" the ball-hitch dryers. *Vitale*, 2018 WL 3868671 at *3. And the question whether Electrolux's conduct was reasonable is a question the jury must consider in determining whether the dryers were defective under either the risk-utility or consumer expectations standards adopted by *Tincher*. *See, e.g., Tincher*, 104 A.3d at 389 ("The risk-utility test offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was reasonable . . ."); *Estate of Hicks v. Dana Cos.*, 984 A.2d 943, 966 (Pa. Super. Ct. 2009) ("Under [the consumer expectations test], the evidence of wide use in an industry may be relevant to prove defect because the evidence is probative, while not conclusive, on the issue of what the consumer can reasonably expect.").

This result is consistent with the reasoning of multiple federal and state courts that have applied Pennsylvania law after *Tincher* to determine that evidence about compliance with minimum testing standards is relevant to a claim for strict product liability. *See, e.g., High v. Pennsy Supply, Inc.*, 154 A.3d 341, 350 (Pa. Super. Ct. 2017) (discussing expert testimony about

compliance with industrial ASTM standards as relevant to the "nature" of the product at issue under the consumer expectations test); *Sliker v Nat'l Feeding Sys., Inc.*, No. 282 CD 2010, 2015 WL 6735548, at *7 (Pa. Com. Pl. Oct. 19, 2015) ("Whether a product comports with industry standards is particularly relevant to factor (2) of" the risk-utility test."); *Mercurio v. Louisville Ladder, Inc.*, No. 3:16-CV-412, 2018 WL 2465181, at *7 (M.D. Pa. May 31, 2018) (rejecting plaintiff's argument that evidence of compliance with industry standards is irrelevant to a claim for strict liability); *Rapchak*, 2016 WL 3752908 at *3.

Not one of the cases cited by Allstate requires any different result. Indeed, three of them predate the Pennsylvania Supreme Court's decision in *Tincher*, which was decided in 2014. *See Lewis*, 528 A.2d at 590 (decided in 1987); *Harsh v. Petroll*, 840 A.2d 404 (Pa. Commonw. Ct. 2003); *Gaudio v. Ford Motor Co.*, 976 A.2d 524 (Pa. Super. Ct. 2009).

Neither of the remaining two cases cited by Allstate decided the question of whether evidence about compliance with minimum testing standards is relevant to a claim for strict liability after *Tincher*. In *Webb v. Volvo Cars of N. Am., LLC*, 148 A.3d 473, 483 (Pa. Super. Ct. 2016), the court avoided deciding the question by granting a new trial on a pre-*Tincher* error, but observed: "[i]t is possible that government/industry standards evidence could be admissible under both [the consumer expectations and the risk-utility tests], one and not the other, or neither." And in *Dunlap v. Fed. Signal Corp.*, 194 A.3d 1067 (Pa. Super. Ct. 2018), the primary question was whether evidence that an alternative design met industry standards was sufficient to prove its effectiveness for all users under the risk-utility test. *See* 194 A.3d at 1073 ("Maher and Roell's proof that their proposed design met the industry standard was not enough to establish a *prima facie* case that it was more effective for all users than the Q-siren.").

All of these authorities teach that, after *Tincher*, evidence about compliance with voluntary minimum testing standards is relevant to negligent and strict product liability claims.[1] Allstate asserts both kinds of claims in this case. Accordingly, evidence about Electrolux's compliance with voluntary minimum testing standards like ANSI Z21.5.1 and UL2158 is relevant and admissible in this case. Allstate's request to exclude this evidence must be denied.

**III.   Evidence about the Consumer Product Safety Commission's post-investigation decision not to take any action against Electrolux is relevant and admissible.**

There is no dispute that the Consumer Product Safety Commission ("CPSC") conducted an investigation of ball-hitch dryers manufactured by Electrolux. *See, e.g., Vitale*, 2018 WL 3868671 at * 2 ("The parties inform me that the CPSC has initiated an investigation to determine whether a recall notice should be issued for Electrolux dryers . . . ."). In June 2018, the CPSC notified Electrolux that, after completing its review of the ball-hitch dryers, it was "not seeking further action involving the [dryers] at this time." (Ex. A, 6/25/18 Letter from CPSC (filed under seal).)[2]

Evidence about the CPSC's decision declining to take further action is relevant and admissible. The court in *Vitale* acknowledged as much:

> Because the Vitales allege that the subject dryer was defective, the lack of any administrative action aimed to protect consumers from the subject dryer is relevant to Electrolux's defense that the subject dryer is not defective.

*Vitale*, 2018 WL 3868671 at * 2.

---

[1] Allstate has also made claims for punitive damages. Electrolux maintains that Allstate—as a subrogee—is not legally permitted to bring a claim for punitive damages. But so long as such claims remain in this case, compliance with voluntary minimum testing standards like ANSI Z21.5.1 and UL2158 are relevant and admissible to Electrolux's defense against those claims.

[2] In keeping with its own motion *in limine* on the subject, Electrolux does not intend to offer any evidence about the decision of Japan's Ministry of Economics, Trade and Industry not to pursue formal action against Electrolux.

In this case, evidence about the CPSC's decision not to take further action against Electrolux is relevant to Electrolux's defense that the dryers at issue in this case were not defective. That evidence is also relevant to determinations about the reasonableness of Electrolux's conduct, as an administrative decision not to take action suggests "an inference that the product is safe." *Vitale*, 2018 WL 3868671 at * 2.

Although the court in *Vitale* ultimately precluded evidence about the CPSC, it relied on the fact that the CPSC investigation was ongoing. According to the *Vitale* court, that fact would complicate any effort to present evidence about the CPSC's inaction, which was a basis for exclusion under Rule 403 of the Federal Rules of Evidence. *Vitale*, 2018 WL 3868671 at *2. But the court observed that, **if the CPSC investigation ended with a decision not take any action against Electrolux, the court's analysis of the issue would change**:

> The parties inform me that the CPSC has initiated an investigation to determine whether a recall notice should be issued for Electrolux dryers, including the model of the subject dryer. This brings into play the possibility that defendant might attempt to introduce the CPSC's refusal to take action after investigating the product, rather than a complete failure to investigate the product. ***Such an evidentiary predicate promises to be more fruitful and may change the balancing test under Rule 403.***

*Id*. (emphasis added).

That very thing has now happened. The CPSC concluded its investigation and decided not to take any further action with respect to the Electrolux-manufactured ball-hitch dryers. (Ex. A, 6/25/18 Letter from CPSC (filed under seal).) Thus, the barriers to admissibility identified by the court in *Vitale* no longer apply.

Nor does 15 U.S.C. § 2074(b), the Consumer Product Safety Act's enabling statute, preclude the admission of evidence about the CPSC's decision not to take further action with respect to the ball-hitch dryers. (Pls.' Omnibus Mot. (Doc. No. 138) at 12.) Federal courts that

have considered the question have uniformly determined that § 2074(b) precludes only the admission of "complete failure by the CPSC to engage in activity on a product," not the CPSC's decision to take no further action after an investigation. *Cummins v. BIC USA, Inc.*, 727 F.3d 506, 513 (6th Cir. 2013); *Morales v. Am. Honda Corp.*, 151 F.3d 500, 513-14 (6th Cir. 1998); *accord Johnston v. Deere & Co.*, 967 F. Supp. 578, 580 (D. Me. 1997) (declining to apply § 2074(b) to preclude evidence that the CPSC engaged in official consideration of a rulemaking, but then withdrew the proposed rule, which were "CPSC actions, not failures to act").

Evidence about the CPSC's decision to take no further action regarding the ball-hitch dryers after completing its investigation is relevant when weighing the dryers' design and Electrolux's conduct. Allstate's request that this Court preclude the admission of evidence about "government inaction" should be denied with respect to the CPSC investigation.

**IV.   Allstate's argument about statistics from the NFPA, USFA, UL, and NIFR lacks merit.**

Allstate contends that this Court should preclude Electrolux from using statistical evidence gathered by various sources—the National Fire Protection Association ("NFPA"), the United States Fire Administration ("USFA"), Underwriters Laboratory ("UW"), and the National Fire Incident Reporting System ("NFIRS")—because that data is unreliable and irrelevant. Allstate's argument is incorrect.

First, contrary to Allstate's contention, neither of the decisions cited in its Motion stands for the proposition that any of these data sources is unreliable. (Pls.' Omnibus Mot. (Doc. No. 138) at 13.) In both *State Farm Fire & Cas. Co. v. Electrolux Home Prods. Inc.*, 980 F. Supp. 2d 1031 (N.D. Ind. 2013) and *State Farm Fire & Cas. Co. v. Electrolux N. Am.*, No. 2:10-CV-01147, 2012 WL 161821 (W.D. Wash. Jan. 4, 2012), the district courts addressed the admissibility of expert opinions offered by Electrolux that it has not offered here. 980 F. Supp. 2d at 1039-40; 2012 WL

161821, at *3-4. Neither case cited by Allstate held that data from the NFPA, USFA, UL, or the NIFR is itself unreliable or inadmissible.

Allstate cites no further authority to support its contention that the data is unreliable. Instead, it devotes a substantial portion of this argument to setting forth unsupported "facts" about how this data is compiled. (*See* Pls.' Omnibus Mot. (Doc. No. 138) at 13-15.) This argument—which is generally unaccompanied by any citation to any source demonstrating that Allstate's description is accurate—is patently insufficient to demonstrate a lack of reliability. To the extent Allstate intends to challenge how data relied upon by Electrolux is compiled, that issue goes to the weight of that evidence, which Allstate may address during cross-examination at trial. *See, e.g., Lynn ex rel. Lynn v. Yamaha Golf-Car Co.*, 894 F. Supp. 2d 606, 618 (W.D. Pa. 2012) ("Any inaccuracy in the data goes to the weight of the evidence, not its admissibility.").

Nor is there merit to Allstate's arguments that the data is irrelevant because it is not specific to a particular defect or manufacturer. Evidence about the inherent risk of fires attendant to all dryers—regardless of design—is directly relevant to what a reasonable consumer would expect from a dryer, the alternate design offered by Allstate's experts, and the reasonableness of Electrolux's conduct. Allstate's motion would hide from the jury that all dryers share this inherent risk, thereby misleading it into believing that fires occur only with Electrolux ball-hitch dryers. This would improperly narrow the focus of trial, where the jury will be asked to consider the "nature of the product." Determination of Design Defect, PA-JICIV 16.20; *see also Tincher*, 104 A.3d at 387 ("The nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller are among considerations relevant to assessing the reasonable consumer's expectations.").

Allstate's request that this Court exclude data compiled by NFPA, USFA, UL, and NIFR lacks merit. Its challenge to the reliability of that data relies on inapposite cases and goes to the weight of the evidence, which is a subject for cross-examination—not a basis for exclusion. Further, that data is relevant to fundamental factors that the jury in this case will consider in determining whether the dryers were defective and in evaluating Electrolux's conduct. Allstate's request to exclude this information must be denied.

## V. Peter Silman has the requisite personal knowledge to support his testimony.

Allstate's requests a blanket exclusion of Peter Silman's testimony because he "did not perform any investigation" into the fires and "played no role in [the dryers'] engineering, design, manufacture or marketing." (Pls.' Omnibus Mot. (Doc. No. 138) at 17.) Allstate's motion ignores relevant Third Circuit precedent and should therefore be denied.

The Third Circuit has repeatedly held that a lay witness may obtain the personal knowledge required by Rules 602 and 701 of the Federal Rules of Evidence by reviewing business records and consulting with colleagues. *E.g., United States v. Polishan*, 336 F.3d 234, 242 (3d Cir. 2003) ("A witness testifying about business operations may testify about 'inferences that he could draw from his perception' of a business's records, or 'facts or data' perceived by him in his corporate capacity.") (quoting *Teen-Ed, Inc. v. Kimball Int'l, Inc.*, 620 F.2d 399, 403 (3d Cir. 1980)); *see also Teen-Ed, Inc.*, 620 F.2d at 403 (finding that a lay witness accountant's review of a company's balance sheets provided him with sufficient personal knowledge to testify about lost profits and inferences that would be drawn from his review of the plaintiff's books). "Lay opinion testimony may be based on the witness's own perceptions and 'knowledge and participation in the day-to-day affairs of [the] business.'" *Polishan*, 336 F.3d at 242 (quoting *Lightning Lube, Inc. v. Witco Corp.*, 4 F.3d 1153, 1175 (3d Cir. 1993)).

Here, Mr. Silman's deposition revealed that he has the requisite personal knowledge for his testimony to be admissible under Rules 602 and 701. He is a "product safety engineer for major appliances in the laundry division" of Electrolux. (Ex. B, 9/15/2017 Deposition of Peter Silman ("Silman Dep.") at 20:20-22 (filed under seal).) In his capacity as a Fed. R. Civ. P. 30(b)(6) witness, Mr. Silman prepared for his testimony by reviewing relevant business records:

> Q: Tell me—first of all, did you prepare to testify today?
>
> A: Yes, I did.
>
> Q: All right. Without disclosing to me the content of the conversations that you had with counsel, if any, tell me what you did to prepare.
>
> A: I've reviewed most of the production documents that our counsel has submitted to you . . . . I reviewed a lot of the claimant files and photos . . . .
>
> Q: Okay. You said reviewed most of the production documents. What do you mean by "production documents"?
>
> A: Product manuals, claimant files, claimant photos, anything that our outside counsel instructed me that we have produced for this case.

(*Id*. at 22:18-23:10.)

Third Circuit law is clear. To the extent that Mr. Silman's testimony is based on his "perception" of the "facts and data" contained in the documents he reviewed in his capacity as Electrolux's product safety engineer, his testimony is admissible. *E.g., Polishan*, 336 F.3d at 242. Moreover, Allstate asks for a blanket exclusion of Mr. Silman's testimony but fails to identify a specific issue or example of testimony that is not supported by his personal knowledge. In the absence of such a demonstration, Allstate's request is premature and should be denied.

**VI.     Evidence about depreciation and actual cash value is relevant.**

Allstate's request for a blanket exclusion of evidence about depreciation and actual cash value is premature and overbroad. Allstate contends that "'depreciation' and 'ACV' have no bearing on the measure of property damage under Pennsylvania law." (Pls.' Omnibus Mot. (Doc. No. 138) at 19.) Not so.

Under Pennsylvania law, the measure of damages for harm to real property depends upon the permanency of the harm, an issue that can depend upon whether the cost of repair disproportionately exceeds the diminution in value of the property caused by the harm:

> In keeping with the purpose of compensatory damages and in prevention of windfall awards, we find it necessary to interpret "permanency" in terms of whether or not the cost of repair would be unfair or inappropriate under the circumstances. Where the cost of repair is shown to be reasonable, the injury to real property is not permanent and the cost of repair would be the appropriate measure of damages. However, where the cost of replacing the real property in its original condition disproportionately exceeds the diminution in the value of the property, the injury to real property is permanent and the cost of repair would not be fair or appropriate. Rather, the proper measure of damages for permanent injury would be the difference between the value of the property before and after the harm. Whether or not an injury to real property is "permanent" is an issue for the trier of fact.

*Duquesne Light Co. v. Woodland Hills Sch. Dist.*, 700 A.2d 1038, 1053 (Pa. Commw. Ct. 1997); *see also Vassell v. Travis*, No. 04-1313, 2007 WL 2571634, at * 4-5 ("Essentially, the question of whether the cost of repair is reasonable or appropriate under these circumstances depends on the accurate value of the property, as well as a comparison between the cost of repair and the diminution of value.") (citing *Duquesne Light Co.*, 700 A.2d at 1053.)

Allstate ignores this Pennsylvania law, as it contends that the relevant measure of damages for the harm to real property in this case is "restoration cost." (Pls.' Omnibus Mot. (Doc. No. 138) at 19.) But that position ignores the guidance of Pennsylvania law, which requires a factfinder to

determine, first, whether the injury to real property is "permanent"—*i.e.,* whether the cost of repair is disproportionate to the diminution of value to the real property. If the cost of repair unreasonably exceeds the diminution in value, the proper measure of damages for the injury to real property is the difference between the value of that property before and after the harm. *Duquesne Light Co.*, 700 A.2d at 1053. If the cost of repair is reasonable, the cost of repair is the appropriate measure of damages. *Id*.

Here, Electrolux has not stipulated that the costs of repairing the real property of Allstate's insureds were reasonable. Thus, this threshold issue for the measure of damages—whether the cost of repair unreasonably exceeded the diminution in value—is in dispute with respect to each of the claims and must be determined by the jury in this case. *Id*. And, for each claim, in order to determine whether the cost of repair disproportionately exceeded the diminution of value to the relevant real property, the jury must ascertain the original value of the relevant property, as that is the starting point to determine the amount of value lost as a result of the dryer fire. Depreciation and actual cash value influence the original value of the relevant real property, and, thus, evidence about those issues is relevant to the issue of damages, and essential for the jury to determine damages in each claim.

Evidence about depreciation and cash value is also relevant to the issue of damages for injury to personal property. Under Pennsylvania law, the measure of damages for loss of personal property is the fair market value of the property at the time of the loss. *E.g., Denby v. North Side Carpet Cleaning Co.*, 390 A.2d 252, 257 (Pa. Super. Ct. 1978); *Daughen v. Fox*, 539 A.2d 858, 864 (Pa. Super. Ct. 1988) ("As in this case, where [personal] property has been destroyed, the measure of damages would be the value of the property prior to its destruction."). "Fair market value" is "[t]he price that a seller is will to accept and buyer is willing to pay on the open market."

*Value*, *Black's Law Dictionary* (10th ed. 2014). "Actual cash value" is a synonym of "fair market value." *Id*. Determining the fair market value of personal property at the time of the loss necessarily requires consideration of depreciation for the period between when the property was new and when it was destroyed. *See Denby*, 390 A.2d at 257 (in a case addressing destroyed carpets, applying depreciation for the period of time between their installation and the damage to determine the value of the carpets at the time of the loss). Accordingly, applying Pennsylvania law, the jury will determine damages for the harm to personal property lost in each fire by ascertaining the value of that property at the time of the fire—and to do so, the jury necessarily must consider evidence of depreciation.

Allstate's request to exclude all evidence about depreciation and actual cash value ignores well-established principles of Pennsylvania damages law. Depreciation and actual cash value bear on the pre-damage value of both real and personal property. And because the jury must consider the pre-damage value of each category of property in determining damages in this case, evidence about depreciation and cash value is relevant and admissible. Allstate's request to exclude it must be denied.

        Respectfully submitted,

        NICOLSON LAW GROUP LLC

BY:    /s/ Melissa L. Yemma
        CHERYL M. NICOLSON, ESQ.
        Attorney I.D. No. 57422
        MELISSA L. YEMMA, ESQ.
        Attorney I.D. No. 92194
        Rose Tree Corporate Center II
        1400 N. Providence Road, Suite 6035
        Media, PA 19063
        (610) 891-0300
        nicolson@nicolsonlawgroup.com
        yemma@nicolsonlawgroup.com

                                      JONATHAN F. FECZKO, ESQ.
                                      Admitted *Pro Hac Vice*
                                      TUCKER ELLIS LLP
                                      950 Main Avenue, Suite 1100
                                      Cleveland, OH 44113
                                      (216) 696-3161
                                      jonathan.feczko@tuckerellis.com

                                      *Attorneys for Defendant Electrolux Home Products, Inc.*

DATE: <u>January 15, 2019</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY; ALLSTATE VEHICLE & PROPERTY INSURANCE COMPANY<br><br>v.<br><br>ELECTROLUX HOME PRODUCTS, INC. | : NO. 5:16-cv-04276-EGS<br>:<br>:<br>:<br>:<br>:<br>: JURY TRIAL DEMANDED<br>: |

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that the foregoing Defendant Electrolux Home Products, Inc.'s Memorandum of Law in Support of its Opposition to Plaintiffs' Omnibus Motion to Preclude Certain Evidence, was served electronically on the date stated below, upon the following:

Raymond E. Mack, Esquire
Patrick A. Hughes, Esquire
de Luca Levine, LLC
Three Valley Square
512 E. Township Line Road, Suite 220
Blue Bell, PA 19422

NICOLSON LAW GROUP LLC

BY:   /s/ Melissa L. Yemma
CHERYL M. NICOLSON, ESQ.
Attorney I.D. No. 57422
MELISSA L. YEMMA, ESQ.
Attorney I.D. No. 92194
Rose Tree Corporate Center II
1400 N. Providence Road, Suite 6035
Media, PA 19063
(610) 891-0300
nicolson@nicolsonlawgroup.com
yemma@nicolsonlawgroup.com

JONATHAN F. FECZKO, ESQ.
Admitted *Pro Hac Vice*

                                                     TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
(216) 696-3161
jonathan.feczko@tuckerellis.com

*Attorneys for Defendant Electrolux Home Products, Inc.*

DATE: January 15, 2019