## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **ALLSTATE INSURANCE COMPANY, ALLSTATE INDEMNITY COMPANY, ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY and ALLSTATE VEHICLE & PROPERTY INSURANCE COMPANY** | **Civil Action No. 16-cv-04276** |
| **Plaintiffs** | |
| **v.** | |
| **ELECTROLUX HOME PRODUCTS, INC.** | **JURY DEMANDED** |
| **Defendant** | |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR RESPONSE IN OPPOSITION TO DEFENDANT ELECTROLUX'S MOTIONS

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Company and Allstate Vehicle & Property Insurance Company ("Allstate", by and through their attorneys, hereby file the foregoing Memorandum of Law in Support of Their Response in Opposition hereby file the foregoing Omnibus Response in Opposition to Defendant's Motions:

- To Preclude Evidence of the Australian Thesis (ECF No. 126),

- To Preclude Evidence of Electrolux's Transition to the Bulkhead Dryer Design (ECF No. 127),

- To Preclude the Admission of Evidence About Other Dryer Fires that Does Not Arise Out of Substantially Similar Incidents (ECF No, 128),

- To Preclude Evidence or Argument About Electrolux's Failure to Recall or Retrofit its Dryers (ECF No. 130),

- To Preclude Evidence of an Investigation of Dryer Fires in Japan (ECF No. 131),

- To Preclude Evidence Relating to Electrolux's Webster City, Iowa and Juarez, Mexico Manufacturing Plants (ECF No. 132),

- To Preclude the Admission of Evidence About Other Lawsuits (ECF No. 133),

- To Preclude Evidence About Personal Injuries and Deaths (ECF No. 134),

- To Preclude Certain Testimony of Michael R. Stoddard, Jr. (ECF No. 135),

- For Bifurcation (ECF No. 136),

- For Spoliation Inference (ECF No. 137), and aver as follows:

## I.    <u>Statement of Facts</u>

Allstate insured the victims of eight separate dryer fires, paid their property damage claims and brought this subrogation action for compensatory and punitive damages against Electrolux Home Products, Inc. ("Electrolux"). Allstate's Amended Complaint sounds in strict products liability and negligence.

All eight fires were caused by Electrolux ball-hitch dryers. Briefly, the ball-hitch dryer built by Electrolux from 1995 through 2013 is the most dangerous clothes dryer ever distributed in the United States. It is defectively designed because of its propensity to cause cabinet lint fires. The dryer traps and ignites lint in a hidden space behind the drum. The fires ignited by the dryer behind the drum can spread to the dryer's combustible plastic front air duct and blower housing. Ignition of those plastic components causes flame and smoke to escape the cabinet. *See* Exhibit A, Michael Stoddard Report, at 5-13, 32-40, 126-131,146-159, 160-163. The fire risks associated with ordinary use of an Electrolux ball-hitch dryer are generally unknown and entirely unnecessary. Several feasible safer alternative dryer designs existed and had been adopted by dryer manufacturers for decades. *See* Exhibit A, Michael Stoddard Report, at 57-64, 94, 126-131, 165-169.

Electrolux knew its dryers were defective and knew how to remedy the defects, but consciously put profits in front of user safety, leaving users exposed to an unnecessary risk of death, personal injury and property damage. Electrolux failed to pull the dryer from the market or issue post-sale warnings in the face of mounting fire damage and personal injury claims, including at least 12 deaths. Electrolux chose instead to blame dryer users and embarked on a scorched earth litigation campaign, which included the intentional destruction of key evidence concerning the dryer's pre- and post-production testing. In 2007, Electrolux quietly began producing dryers built to a safer design and gradually phased out the defective ball-hitch dryer. Electrolux closed the factory where the ball-hitch dryer was designed, developed, tested and built in 2011. By 2013, Electrolux demolished the factory and laid off every engineer involved with the ball-hitch dryer.

Electrolux has filed 11 separate Motions in Limine. Allstate responds to all 11 Motions in a single Omnibus Response for the sake of efficiency. For the reasons stated below, Electrolux's Motions in Limine should be denied.

## II.     Legal Standard

"An *in limine* motion is designed to narrow the evidentiary issues for trial and to eliminate unnecessary trial interruptions." *Frintner v. TruePosition*, 892 F. Supp. 2d 699, 707 (E.D. Pa. 2012) (quotations omitted). "Evidence shall be excluded in limine only when it is shown that the evidence is inadmissible on all potential grounds." *Speaks v. Mazda Motor Corp.*, 118 F. Supp. 3d 1212, 1217 (D. Mont. 2015).

Federal Rule of Evidence 402 states that "evidence which is not relevant is not admissible." Fed. R. Evid. 402. Relevant evidence is defined as any evidence "having any tendency to make the existence of any fact that is of consequence to the determination of the

action more probable or less probable than it would be without the evidence." See Fed. R. Evid. 401. The Supreme Court has characterized this standard as a "liberal one." *Daubert v. Merrell Dow Pharmac., Inc.*, 509 U.S. 579, 587 (1993).

Even if evidence is relevant, it may still be inadmissible "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, or by consideration of undue delay, waster or time, or needles presentation of cumulative evidence." *See* Fed. R. Evid. 403. The Third Circuit has defined the phrase "danger of unfair prejudice" as an "undue tendency to suggest decision on an improper basis." *Bhaya v. Westinghouse Elec. Corp.,* 922 F.2d 184, 188 (3d. Cir. 1990).

### III.   Legal Argument

The evidence that Electrolux seeks to exclude from trial is damning for Electrolux, but not inadmissible. Allstate's claims sound in strict products liability and negligence. The following addresses each of Electrolux's motions.

### 1.   Response to Defendant's Motion Preclude the Admission of Evidence About Other Lawsuits (ECF No. 133).

"Other lawsuit" evidence is admissible to prove that Electrolux failed to exercise ordinary care as a manufacturer of consumer appliances to produce the safest dryer design feasible. Such evidence is also admissible to prove that Electrolux failed to exercise ordinary care by not issuing post-sale warnings or recalls after discovery of the product's unreasonably dangerous condition. "Other lawsuit evidence" is also admissible to establish the boundaries of "foreseeable use" at the time the subject dryers were sold and/or before the subject dryers failed catastrophically in the field.

The dryers at issue were manufactured between 2003 and 2008. Lawsuits filed against Electrolux before these dryers were manufactured establish notice to Electrolux of the ball-hitch

dryer's defective condition. Expert testimony will establish that Electrolux's duty of ordinary care required Electrolux to identify, monitor and analyze product defect allegations arising from field use – including through lawsuits filed against the manufacturer - and to determine whether the product performed as safely in the field as it performed during design and development tests in the laboratory. *See* Exhibit B, Dr. William Vigilante Report, at 10-11. Electrolux identified escape of flame and smoke from the cabinet as the most severe use-hazard presented by its ball-hitch dryer during development. *See* Design FMECA, ECF No. 112-6 (previously filed under seal). Electrolux should have investigated the cause of the alleged field failures complained of in the "other lawsuits," especially because they included allegations of injury or damage caused by flame and smoke that escaped the cabinet during use, and adjusted the design (by switching to a bulkhead dryer and/or by switching from plastic front air ducts and blower housings to steel components) to reduce as much as feasible the risk of death, injury or property damage presented by foreseeable use. Instead, experts will testify, Electrolux kept this "other lawsuit" and claims data away from its design engineers (the very personnel who needs to have it in order to ensure that the safest feasible design is being built) and fought fiercely in litigation to blame users for causing both the initial cabinet lint fires that occurred and the property damage that resulted, both of which could have been avoided by Electrolux's incorporation of feasible design changes. *See* Exhibit B, Dr. William Vigilante Report, at 62-64. Had Electrolux met the standard of care and switched to safer dryer design prior to the distribution of the subject dryers, these fires would not have occurred. *See* Exhibit A, Michael Stoddard Report, at 57-64, 94, 126-131, 165-169.

Similarly, "other lawsuits" brought after 2008, but before 2016 (when the last fire at issue occurred), establishes notice of the allegedly defective condition that caused the damages

in this case in time for Electrolux to have issued post-sale warnings or have issued a safety recall of the dryers. Expert testimony will establish that Electrolux's failure to properly investigate, analyze and respond to the fires reported in these "other lawsuits" contributed to the cause of Electrolux's failure to issue post-sale warnings and failure to recall the defective ball-hitch dryers, which breached the duty of care owed under the circumstances.

Moreover, the evidence of "other lawsuits" establishes the absurdity of Electrolux's primary litigation defense. Electrolux, through forensic consultants, seeks to establish at trial that its ball-hitch dryers are "reasonably safe" as designed *when used in strict accordance with Electrolux's written instructions, recommendations and warnings*. Electrolux knew or should have known, according to expert testimony, long before the dryers at issue were sold or these fires occurred that its written instructions, recommendations and warnings were ineffective, inadequate and were not to be relied upon to ensure dryer user safety by an ordinary and responsible manufacturer of consumer products simply by studying and investigating these "other lawsuits." Electrolux consistently argued (as it does here) that ball-hitch dryer fires are caused by users failing to strictly adhere to Electrolux's written instructions, recommendations and warnings, but Electrolux never sought to improve its design or improve the literature distributed with the product. In 2014, after settling a class action lawsuit and before these fires occurred, Electrolux for the first time published step-by-step instructions about how to perform the 18-month cleaning procedure it recommends in its manual. Even then, Electrolux distributed these instructions to repair contractors in a Service Bulletin and did not attempt to communicate the procedure to users whose very safety (according to Electrolux) depended on proper performance of the recommended cleaning procedure.

"Other lawsuit" evidence is also admissible to prove that the dryers at issue were sold

in a defective condition. Under Pennsylvania law, a plaintiff may show that a product is unreasonably dangerous under the risk utility test. "The risk-utility test offers courts an opportunity to analyze *post hoc* whether a manufacturer's conduct in manufacturing or designing a product was reasonable . . . ." *Tincher v. Omega Flex, Inc.*, 104 A.3d 328, 389 (Pa. 2014).

Electrolux's design decisions were unreasonable. Electrolux, according to experts who will testify at trial, should have switched from plastic to steel, in part, because of the reports of fires contained in the "other lawsuits." In fact, Electrolux considered switching from plastic front air ducts and blower housings to steel front air ducts and blower housings in the late 1990s. Electrolux's design engineers performed tests and determined that using steel reduced the risk of property damage posed by cabinet lint fires. Electrolux calculated that a reduction in products liability exposure would offset any rise in production costs. *See* Frigidaire Memo, Steel Air Duct vs. Current Poly-Pro Air Duct, ECF No. 112-13, at 3 (previously filed under seal). "Other lawsuits" was actual a factor considered by Electrolux when making safety-related design decisions. To determine whether Electrolux acted with ordinary care and conducted a reasonable risk-utility analysis, the jury should be informed that products liability lawsuits involving "ball-hitch" dryer fires that allegedly caused property damage did not abate, and, in fact, only increased, after Electrolux considered and rejected the proposed switch from plastic to steel.

Allstate will introduce evidence about other lawsuits filed against Electrolux that allege its ball-hitch dryers are defective for the same reasons that Allstate alleges here, including:

1) A class action lawsuit which involves the same design defect claims and lint ignition scenario pertaining to Electrolux's ball-hitch style dryers as asserted by Plaintiffs in the instant matter. *Shawn Roberts et al. v. Electrolux Home Products, Inc.,* SACV12-1644-CAS(VBKx) (C.D. Ca).

2) A mass tort litigation containing over 200 claims involving the same design defect claims and lint ignition scenarios pertaining to Electrolux's ball-hitch style dryers as asserted by Plaintiffs in the instant matter. *State Farm Fire & Casualty Company et al v. Electrolux*, 1:11-cv-08946 (N.D. Il)

3) Several consolidated actions containing over 180 claims involving the same design defect claims and lint ignition scenarios pertaining to Electrolux's ball-hitch style dryers as asserted by Plaintiffs in the instant matter filed by Allstate Insurance Company against Electrolux.[1]

This evidence has a tendency to establish that Electrolux failed to exercise ordinary care, conducted a flawed risk utility analysis, and failed to design the safest dryer feasible. Expert testimony, of course, will establish that the property damage alleged here was caused, in part, by ignition of the dryers' plastic front air ducts and blower housings. *See* Exhibit A, Michael Stoddard Report, at 32.

Electrolux's concerns of prejudice are overstated. First, there is no *unfair* prejudice. According to expert testimony, Electrolux refused to re-design its dryer when faced with overwhelming evidence that the ball-hitch dryer as designed caused unintended injuries or damage in the field, despite the availability of several feasible engineering solutions that would have substantially reduced or eliminated the known use-hazards. Electrolux is prejudiced by these facts, but not unfairly so.

Second, if the Court finds that Electrolux will be unfairly prejudiced by the introduction of "other lawsuit" evidence, that can easily be cured by issuance of an appropriate jury instruction. Neither Judge Pappert in *Cloud* nor Judge Lloret in *Vitale* considered a curative jury

---

[1] *See, e.g., Allstate Ins. Co. v. Electrolux Home Prod., Inc.*, No. 2:16-cv-06514-DSF-RAO (C.D. Cal.); *Allstate Ins. Co. v. Electrolux Home Prod., Inc.*, 1:16-cv-02080 (D. Colo.); *Allstate Ins. Co. v. Electrolux Home Prod., Inc*, 1:16-cv-09639 (N.D. Il.); *Allstate Ins. Co. v. Electrolux Home Prod., Inc*, 1:16-cv-06804 (S.D.N.Y.); *Allstate Ins. Co. v. Electrolux Home Prod., Inc*, 1:16-cv-01946 (N.D. Oh.); *Allstate Ins. Co. v. Electrolux Home Prod., Inc*, 5:18-cv-00699-JFL (E.D. Pa.); *Allstate Ins. Co. v. Electrolux Home Prod., Inc*, 4:16-cv-03666 (D.S.C.); *Allstate Ins. Co. v. Electrolux Home Prod., Inc.,* 3:17-cv-00391-JCH (D. Conn.).

instruction. Judge Pappert was concerned that the jury would be unable to understand the outcomes of these actions and, if that information was withheld, would assume the worst. Judge Lloret was also concerned that the jury would infer from evidence of these lawsuits that Electrolux's product was defective. Jurys are presumed to follow instructions. *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). An instruction that explains to the jury that jury should not infer that the product is defective merely because it has been the subject of "other lawsuits," but that the jury may consider the fact of "other lawsuits" when performing the risk-utility test would cure any perceived prejudice.

Finally, the probative value of the "other lawsuit" evidence is high and is not substantially outweighed by the danger of unfair prejudice. The evidence should be deemed admissible for the purposes articulated herein.

### 2. Response to Defendant's Motion To Preclude the Admission of Evidence About Other Dryer Fires that Does Not Arise Out of Substantially Similar Incidents (ECF No. 128).

Electrolux seeks to shield the jury from considering that Electrolux is aware of approximately 6,000 substantially similar ball-hitch dryer fires. Electrolux testified that it investigated each fire and that most occurred due to heat source ignition of lint within the hidden space behind the drum and that the fires spread internally and externally after the plastic front duct and blower housing ignited. Like here, however, Electrolux contends that all of the fires were "caused" by improper dryer installation, maintenance or use.

Evidence of these fires is admissible for many purposes, including to prove notice and the product's defective condition. *See, e.g., In re Tylenol (Acetaminophen) Mktg., Sales Practices & Products Liab. Litig.*, No. 2:12-CV-07263, 2016 WL 1569719, at *26 (E.D. Pa. Apr. 19, 2016). The prior incidents must be "substantially similar" to the subject incident to be admissible. *Id.* However, there is a relaxed burden of proof to show the prior incidents were

"substantially similar" when the evidence is used only to establish notice of the danger. *See Parvez & Razia Yazdani v. BMW of N. Am., LLC*, 188 F. Supp. 3d 486, 492 (E.D. Pa. 2016) (citing *Benedi v. McNeil–P.P.C., Inc.*, 66 F.3d 1378, 1386 (4th Cir.1995)).

Here, expert testimony will establish that Electrolux failed in its duty to properly design and test the ball-hitch dryer during the design and development phase. Allstate's experts will point to the fact that pre-production tests revealed the dryer's propensity to trap and ignite lint in the hidden space behind the drum during normal use, but that Electrolux failed to properly consider that data and make appropriate design changes. Post-production, but before the subject dryers were built and sold, Electrolux received reports of ball-hitch dryer fires from the field in the form of warranty and claims data. Electrolux's analysis of that data should have caused the manufacturer to determine that subsequent ignition of the dryer's plastic front air ducts and blower housings was responsible for causing smoke and flame to escape the cabinet. An ordinary and responsible consumer appliance manufacturer privy to such knowledge would have switched designs from ball-hitch to bulkhead and switched components from plastic to steel to reduce the risk of injury or damage to users caused by foreseeable product use.

The occurrence of ball-hitch dryer fires in the field should also have caused Electrolux to change its warnings. Electrolux knew or should have known based on an analysis of the available "other accident" data that users were not receiving or understanding the information supplied by Electrolux which Electrolux had previously determined was necessary for the product's safe use. With respect to dryers already in the field, Electrolux should have issued appropriate post-sale warnings and/or recalled the product to reduce the risk of injury or damage caused by the product's latent defects. With respect to dryers yet to be sold, Electrolux should have switched designs and switched components because it knew or should have known that its

product literature was ineffective and inadequate to cause the product to be used safely.

"Other accident" evidence is also admissible to prove defect. The jury should be permitted to hear that the ball-hitch design's safety performance record includes reports of more than 6,000 field fires and that the alleged safer alternative design, which has been built by Electrolux and used in the field for more than 12 years, has little or no fire history. The relative safety performance of the two designs built by the same manufacturer is likely the most probative evidence of defect that exists or that could exist.

Proof of these "other accidents" will be offered through the testimony of expert witnesses, who investigated hundreds of these fires personally and who reviewed and reasonably relied upon the "other accident" data supplied by Electrolux during discovery in forming their opinions about the ball-hitch dryer's defective condition. Exhibit A, Michael Stoddard Report, at 217.

### 3. Response to Defendant's Motion To Preclude Evidence of Electrolux's Transition to the Bulkhead Dryer Design (ECF No. 127).

Electrolux's ball-hitch dryer is defective, in part, because it has a tendency to trap and ignite lint within a hidden space behind the drum. Electrolux's ball-hitch dryer is a "closed drum" design. Since the 1960s, most dryer manufacturers have switched to an "open drum" design to reduce the risk of cabinet lint fires. "Open drum" dryers cannot accumulate and ignite lint behind the drum. *See* Whirlpool Letter, ECF No. 112-11 (previously filed under seal); Exhibit A, Michael Stoddard Report, at 57-64, 94, 165-169. Electrolux admits it began building "open drum" dryers in 2007. Electrolux refers to its "open drum" design as a "bulkhead" dryer. All of the fires at issue here occurred after 2012. *See* Compl., ECF No. 1, at ¶ 4.

The fires at issue did not occur until after Electrolux began building "bulkhead" dryers and therefore evidence of the switch cannot be precluded as a subsequent remedial measure.

Evidence of measures taken by Electrolux prior to the harm or injury (i.e., the fires) occurring do not fall within the exclusionary scope of Rule 407.

> Rule 407 of the Federal Rules of Evidence provides, in relevant part:

> When measures are taken that would have made an **<u>earlier</u>** injury or harm less likely to occur, evidence of the subsequent measures is not admissible to prove: negligence; culpable conduct; a defect in a product or its design; or a need for a warning or instruction.

Fed. R. Evid. 407 (emphasis added). The Advisory Committee Notes provide additional clarification to Rule 407. Under the 1997 Amendments to the Rule, it states "the rule applies only to changes made after the occurrence that produced the damages giving rise to the action." *Id.* It further states that "[e]vidence of measures taken by the defendant prior to the "event" causing "injury or harm" do not fall within the exclusionary scope of Rule 407 even if they occurred after the manufacture or design of the product. *See Chase v. General Motors Corp.*, 856 F.2d 17, 21-22 (4th Cir. 1988). The substance of Rule 407 has not been changed since.

The Third Circuit Court of Appeals addressed the scope of Rule 407 in a footnote in *Diehl v. Blaw Knox*, 360 F.3d 426 (3rd Cir. 2004). The relevancy of *Diehl* to this case is discussed in footnote 5 wherein – even though the issue was not on appeal – the Third Circuit instructed the trial court to reconsider its exclusion of evidence that the defendant's redesign to the product at issue prior to the plaintiff's injury was a subsequent remedial measure. *Id.* at 433 n.5. The Third Circuit explained that defendant's redesign "should have never been characterized as a subsequent remedial measure" because the redesign was done "prior to the accident" and "Rule 407, by its terms, applies to remedial measures taken after an injury or harm allegedly caused by an event." *Id.* Electrolux has not provided any authority to suggest otherwise.

The cases Electrolux relies upon are not dispositive. For example, Electrolux relies upon

the ruling in *Pennsylvania Trust Co. v. Dorel Juvenile Group, Inc.* wherein the court ruled that evidence a defendant stopped selling a product was inadmissible under Rule 407, even though defendant's employee testified the production stopped because sales were slow. 851 F.Supp.2d 831, 848 (E.D. Pa. 2011). Electrolux's reliance on *Pennsylvania Trust Co.* is misplaced because, unlike here, the remedial measure addressed by the court occurred after the injury to the plaintiff. *Id.* Electrolux's reliance on *Buckman v. Bombardier Corp.*, 893 F. Supp. 547 (E.D.N.C. 1995) shares the same flawed analysis.

Furthermore, this evidence is relevant to Allstate's strict liability and negligence claims and Electrolux has not argued otherwise in its brief. Allstate intends to introduce evidence that the bulkhead design is a safer design than Electrolux's ball-hitch design because it reduces the risk of internal lint ignition in the dryer cabinet. Electrolux intends to argue that its ball-hitch dryer design is as safe as the bulkhead design and that Allstate does not have fire rate incident evidence from bulkhead manufacturers to suggest the ball-hitch dryers have a higher fire rate. Allstate intends to introduce evidence that Electrolux has experienced few internal lint ignition fires in its bulkhead design. As such, evidence that Electrolux started manufacturing and selling bulkhead dryers years before the fires in this case occurred is relevant to Allstate's strict liability and negligence claims about the defective condition of the ball-hitch design dryers. Accordingly, Electrolux's motion should be denied.

### 4. Response to Defendant's Motion For Bifurcation (ECF No. 136).

Electrolux seeks to bifurcate the issues of liability and punitive damages for no good reason. The court must consider whether the facts of the case warrant bifurcation. The parties will introduce the same evidence at trial whether the issues of liability and punitive damages are tried separately or together. This case will be costlier and less efficient if tried in two stages. Electrolux has failed to articulate how it will be prejudiced if forced to defend Allstate's

negligence and strict products liability causes of action along with any right to damages incident thereto.

### 5. Response to Defendant's Motion To Preclude Evidence About Personal Injuries and Deaths (ECF No. 134).

Applying Pennsylvania's risk-utility test, a jury is tasked with consideration of several factors related to the product's risks and utility, including the severity of harm posed by the product as designed. *Tincher*, 104 A.3d at 389 (a jury is to consider under the risk utility analysis "[t]he safety aspects of the product—the likelihood that it will cause injury, and the probable seriousness of the injury.").

Electrolux regarded the risk of personal injury and death caused by flames escaping the dryer during use as the most severe hazard posed by its ball-hitch dryer during the product's design and development. *See* Design FMECA, ECF No. 112-6 (previously filed under seal). Electrolux claims to have constantly monitored field performance in order to continually assess product safety after production began. Electrolux's claims data indicates that at least 12 people have died and many more have been injured as a result of several thousand ball-hitch dryer fires in the last 20 years. *See* Selected Claims Data, ECF No. 112-15 (previously filed under seal) (isolating Electrolux dryer fire claims coded for personal injury and death). Evidence of injury or death establishes the seriousness of potential harm posed by the product's use and therefore should be considered by the jury when applying the risk-utility test. Also, evidence of injury or death combined with Electrolux's failure to improve the product's safety and/or recall the product, has a tendency to prove that Electrolux failed to exercise ordinary care, failed to design the safest dryer feasible and consciously disregarded the rights and safety of users. There is nothing unfairly prejudicial about such evidence.

**6.      Response to Defendant's Motion For Spoliation Inference (ECF No. 137).**

Allstate did not intentionally destroy evidence. Every dryer still at issue in this case was preserved and made available to Electrolux at great expense to Allstate. Meanwhile, Allstate voluntarily dismissed any claim that involved a dryer that was inadvertently discarded during the lead-up to litigation. Most of the "evidence" that Electrolux claims has been "destroyed" – components of the independent exhaust venting to which certain dryers were connected – were left intact at the fire scene and may still exist. Electrolux made no effort whatsoever to gather this "evidence," never requested to view the minimally damaged homes to determine whether this "evidence" remained and largely made no attempt to question fact witnesses about the condition of the "evidence" pre- and post-fire or learn whether the "evidence" was, in fact, destroyed. Electrolux admits that none of these fires began in the independent exhaust venting to which the subject dryers were attached. Allstate behaved reasonably under the circumstances. All relevant evidence was preserved and made available to Electrolux for inspection, testing and analysis. No spoliation occurred.

"Spoliation occurs where: the evidence was in the party's control; the evidence is relevant to the claims or defenses in the case; there has been actual suppression or withholding of evidence; and, the duty to preserve the evidence was reasonably foreseeable to the party." *Bull v. United Parcel Serv., Inc.*, 665 F.3d 68, 73 (3d Cir. 2012). Whether sanctions for spoliation, including an adverse inference, are warranted depends on "(1) the degree of fault of the party who altered or destroyed the evidence; (2) the degree of prejudice suffered by the opposing party; and (3) whether there is a lesser sanction that will avoid substantial unfairness to the opposing party, and, where the offending party is seriously at fault, will serve to deter such conduct by others in the future." *Id.* "The spoliation inference is an adverse inference that permits a jury to infer that destroyed evidence might or would have been unfavorable to the

position of the offending party." *Mosaid Techs. Inc. v. Samsung Elecs. Co.*, 348 F. Supp. 2d 332, 335–36 (D.N.J. 2004).

  i.  *The Almodovar Claim*

  Electrolux first faults Allstate for an alleged failure to retain the premises vent hood. There is no evidence that Allstate has withheld or suppressed the premises vent hood because there is no evidence that it no longer exists. In all likelihood, it is still present at the Almodovar residence today.

  Electrolux next faults Allstate for an alleged failure to retain the flexible foil transition vent. There is no prejudice to Electrolux here. Electrolux's expert's opinion would be the same in this case regardless of whether it inspected the flexible foil transition vent. The actual condition of any flexible foil vent matters very little to Electrolux's experts. In no case has Electrolux or its experts ever attempted to quantify any amount of lint found in a vent to determine how (or even if) it reduced airflow within the dryer. Electrolux's experts' position is that the use of flexible foil venting in and of itself restricts airflow and leads to lint accumulation within the dryer cabinet, regardless of its condition. *See* Electrolux's Almodovar Report, ECF No. 137-3, at 43.

  Even in cases – like the Weiss claim in this action – where Electrolux's experts have inspected a flexible foil transition vent and found it contained "minimal amounts of lint", they have concluded that the use of flexible foil contributed to reduced airflow within the dryer and caused the lint accumulation that led to the fire. *See* Exhibit C, Electrolux's Weiss Report, at 13, 52-53. Similarly, Electrolux's expert concludes in the Gutierrez claim that the use of flexible foil venting for approximately 3-4 years at some point of time in the dryers' lifetime contributed to increased lint accumulation within the dryer, even though the flexible foil vent had been

replaced years before the fire and was therefore unavailable for inspection. Exhibit D, Electrolux's Gutierrez Report, at 47-48. Electrolux's expert has no problem concluding that the Almodovars' use of flexible foil resulted in an increased lint accumulation within the dryer, even though it faults Allstate for its failure to inspect the vent. *See* Electrolux's Almodovar Report, ECF No. 137-3, at 54. Accordingly, there is no prejudice by this alleged failure to retain the flexible foil vent.

ii.     *The Bullene Claim*

In the Bullene claim, Electrolux faults Allstate for an alleged failure to retain the premises vent hood. Again, there is no evidence that the vent hood has ever been replaced, destroyed, or otherwise no longer exists. Allstate did not suppress or withhold this evidence. Electrolux argues it is prejudiced by this failure because it has no way to determine if it had a bird screen attached to the outlet of the hood. Allstate provided Electrolux pictures of the vent hood immediately after the fire during discovery and there was no evidence of any bird screen attached to the hood. Exhibit E, Bullene Scene Photographs.

iii.     *The Gray Claim*

Electrolux alleges Allstate spoliated the permanent vent system and vent hood in the Gray claim. First, Allstate cannot be found to have spoliated the permanent vent system or vent hood in the Gray claim because it did not control this evidence. Mr. Gray rented an apartment and, though he owned the dryer, did not own the permanent dryer vent or vent hood. This is evidenced by the fact that the maintenance department in his building was responsible for cleaning and maintaining the permanent vent system and vent hood. Exhibit F, John Gray Dep. Tr., at 8, 29-34, 89. Allstate has no right to retain property that is not owned by its insureds.

Additionally, there is no prejudice to Electrolux. Electrolux claims it is prejudiced

because its experts cannot "quantify the amount of additional lint present that would have acted to restrict air flow at that location." This argument lacks merit. Electrolux's experts do not ever attempt to quantify the amount of lint found in a dryer or vent system to determine how much it actually restricted airflow. Moreover, Allstate extensively documented the fire scene and turned over this information to Electrolux during discovery, including pictures showing the condition of the vent hood and permanent vent system. Exhibit G, Gray Claim Selected Scene Photographs. The alleged failure to collect this evidence did not impact Electrolux's expert's ability to opine that the lint accumulated the Grays' dryer was caused by an alleged improper installation of the vent hood and permanent vent. *See* Electrolux's Gray Report, ECF No. 137-5, at 51-52.

### iv.    The Quinn Claim

Electrolux argues Allstate failed to retain the premises vent hood and flexible foil transition vent. There is no spoliation here because there is no evidence that the vent hood has ever been replaced, destroyed, or otherwise no longer exists. Allstate did not suppress or withhold this evidence.

Further, as explained above in reference to the Almodovar claim, Electrolux and its experts are not prejudiced by the alleged failure to retain a flexible foil transition vent. Electrolux's expert had no issue concluding that the use of flexible foil transition vent caused the lint accumulation that led to the subject fire. *See* Electrolux's Quinn Report, ECF No. 137-6, at 49, 51.

### v.    The Venbrux Claim

Electrolux faults Allstate for allegedly failing to retain portions of the rigid permanent vent system and the metal vent hood. There is no evidence that the metal vent hood has been

spoliated. Rather, Mr. Venbrux testified that he believed it was still installed at the property. Exhibit H, Greg Venbrux Dep. Tr., at 19. Further, Electrolux has not identified any prejudice related to the alleged failure to retain portions the permanent vent system. Electrolux does not argue that this vent system was installed incorrectly or contributed to reduced airflow.

Accordingly, no sanctions for spoliation is warranted in any claim at issue here.

### 7.    Response to Defendant's Motion To Preclude Evidence of an Investigation of Dryer Fires in Japan (ECF No. 131).

Several ball-hitch dryer fires occurred in Japan in 2004. The Japanese government ordered Electrolux to stop dryer distribution in that country after an investigation revealed that the dryers had ignited lint trapped by the dryer in the hidden space behind the drum, which subsequently ignited the plastic front ducts and blower housings. *See* Consumer Product Safety NITE Alert 62, ECF No. 112-9 (previously filed under seal); Electrolux Japan Investigation Diary Notes, ECF No. 112-10 (previously filed under seal). Electrolux designed a system that detected reduced airflow and disabled dryer operation, which Electrolux claimed reduced the ability of the dryer to collect and ignite lint behind the drum and thus reduced the risk of fire. *See, e.g.,* Exhibit A, Michael Stoddard Report, at 219. Electrolux offered to include this safety system in all dryers distributed in Japan prospectively, but the Japanese government refused to lift its ban.

Allstate shall present expert testimony at trial that establishes that the ball-hitch dryer fires at issue in Japan were substantially similar to the ball-hitch dryers involved in this case, that all of the dryers were designed and built at the same people at the same plant in Webster City, Iowa, and that all of the dryers failed by fire in the same manner when used in the field. Exhibit A, Michael Stoddard Report, at 218-219. Evidence will also be presented that establishes that Electrolux later incorporated the safety switch developed by Electrolux's design

engineers as a result of the Japanese investigation into the design of the ball-hitch dryers sold in the United States after 2009, but that no post-sale warnings were issued to Allstate's insureds and Allstate's insureds defective ball-hitch dryers were not recalled.  Electrolux failure to issue post-sale warnings or recall the dryers after Electrolux determined that a simple switch incorporated into the dryer's pre-existing design reduced the likelihood of injury or damage represents a departure from the standard of care applicable to consumer appliance manufacturers under the circumstances. Exhibit A, Michael Stoddard Report, at 120-121.

Again, Electrolux overstates Rule 403 dangers. Electrolux is not unfairly prejudiced by the introduction of evidence of the Japanese fires or the Japanese investigation. Such evidence, meanwhile, is highly probative of notice and defect and cuts against Electrolux's defenses. Evidence related to the Japanese fires, the investigation and Electrolux's subsequent design change should be admitted.

### 8.    Response to Defendant's Motion To Preclude Certain Testimony of Michael R. Stoddard, Jr. (ECF No. 135).

Allstate's expert, Michael Stoddard, is qualified to offer expert testimony in this case. Mr. Stoddard is an expert in fire origin and cause analysis and the design, operation, and failure of consumer appliances. He opines that Electrolux defectively designed the subject dryers and these defects caused Allstate's damages. Electrolux does not challenge Mr. Stoddard's qualifications to offer expert testimony about the dryers' design, operation, and defects and how those defects caused the subject dryer fires.

Electrolux takes issue only with a few statements Mr. Stoddard made in his report regarding the absence of warnings and Electrolux's failure to maintain formal internal Product Safety standards and controls, both of which are facts not opinions.

Assuming that which Electrolux takes issue with is somehow characterized as opinions,

Mr. Stoddard is well-qualified to give them. In order to qualify as an expert witness, the witness must have specialized knowledge in the area of testimony resulting from knowledge, skill, experience, training, or education. *See e.g. Curry v. Royal Oak Enterprises, LLC*, No. CIV.A. 11-5527, 2013 WL 3196390, at *2 (E.D. Pa. June 25, 2013). The Third Circuit has "eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications." *United States v. Fleet Mgmt., Ltd.*, 332 F. App'x 753, 757 (3d Cir. 2009) (quoting *In re Paoli Railroad Yard PCB Litig.,* 35 F.3d 717, 741 (3d Cir.1994)). At minimum, an expert's "skill or knowledge" must be "greater than the average layman with regard to the scientific matter at issue." *Elcock v. Kmart Corp.,* 233 F.3d 734, 742 (3d Cir.2000). "[I]t is an abuse of discretion to exclude testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Curry, LLC*, 2013 WL 3196390, at *2 (quoting *Pineda v. Ford Motor Co.,* 520 F.3d 237, 244 (3d Cir.2008)). The Federal Rules of Evidence Advisory Committee has stated:

> [n]othing in [Rule 702] is intended to suggest that experience alone – or experience in conjunction with other knowledge, skill, training, or education – may not provide a sufficient foundation for expert testimony.  To the contrary, the text of Rule 702 expressly contemplates that an expert may be qualified on the basis of experience. In certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony."

Fed. R. Evid. 702 (2005) (Advisory Committee's Note, 2000 Amendment).

> i.    *Mr. Stoddard is qualified to opine about the absence of warnings and the failure to follow the Safety Hierarchy.*

Mr. Stoddard is qualified to opine about the absence of warnings and Electrolux's failure follow the Hierarchy of Safety Engineering and Product Safety. Electrolux misstates Mr. Stoddard's opinions regarding the adequacy of the warnings relative to the subject dryers. Mr.

Stoddard has not offered, nor does he intend on offering, any opinions on the adequacy of warnings in Electrolux's product literature related to the field of "human factors," such as the propriety of the color, font, or style of a warning, or a consumer's ability or inclination to comprehend or react to any warning or instruction.[2]

Rather, Mr. Stoddard's opinion on "warnings" concerns Electrolux's failure to warn – at all – as it relates to a method of addressing known hazards inherent in a product. Electrolux does not and cannot dispute that the Hierarchy of Safety Engineering and Product Safety is the standard of care for a manufacturer of a consumer product. *See* Exhibit A, Michael Stoddard Report, at 178, 205 (summarizing Electrolux corporate designees' testimony about the Hierarchy of Safety Engineering and Product Safety); Exhibit I, Dr. J.P. Purswell Report (Christie), at 4, ¶ 8 (Electrolux's expert endorsing the Hierarchy of Safety Engineering as the standard). Under this principle of hazard mitigation, upon recognition of a hazard, a manufacturer should first attempt to change its design to eliminate the hazard, and if that was not possible, place a guard to protect against the hazard. Only as a last result should a manufacturer rely on a warning or instructions because doing so places the burden of hazard mitigation on an ignorant consumer. *See* Exhibit A, Report of Michael Stoddard, at 220 (explaining the Hierarchy of Safety Engineering and Product Safety).

The testimony that Electrolux objects to does two things. First, it points out that Electrolux failed to employ any of the hazard mitigation strategies identified by the Hierarchy of Safety Engineering and Product Safety (including warnings) because none of the warnings or instructions provided by Electrolux advise the user that dryer has a propensity to trap and ignite lint in the hidden space behind the drum. See Exhibit A, Report of Michael Stoddard, at

---

[2] Allstate retained William J. Vigilante, Jr., Ph.D to testify in this regard.

221. Second, though Electrolux contends certain instructions were provided that associate lint with a fire hazard, Mr. Stoddard points out that Electrolux's reliance on instructions was improper based on the Hierarchy. Exhibit A, Report of Michael Stoddard, at 221-222. Under the Hierarchy, Electrolux should have designed out the hazard, guarded against it, or incorporated a warning system (i.e. an airflow monitor or maintenance reminder) into the product's design, rather than relying on written instructions, recommendations and warnings. Exhibit A, Report of Michael Stoddard, at 221-222.

Mr. Stoddard possesses specialized knowledge about clothes dryer design, clothes dryer operation, clothes dryer failure modes, and the safety design-engineering principles applicable to clothes dryer manufacturers. Mr. Stoddard does not need a background in Human Factors and/or Ergonomics to point out that Electrolux did not warn about the dryers' latent hazards and that Electrolux breached the applicable standard of care by using written instruction, recommendations and warnings to reduce risks caused by latent product defects. *See* Exhibit J, *State Farm Fire & Casualty Company a/s/o Deitch v. Electrolux Home Products, Inc., et al.*, No. 2:10-cv-03901 at 1-6 (E.D.N.Y.) (Transcript) (holding Mr. Stoddard is qualified to give this exact testimony).

The Third Circuit has deemed a product design expert competent to offer this exact type of "warnings" testimony. In *Pineda v. Ford Motor Company,* the Third Circuit overturned the district court's preclusion of a product design expert witness who opined that a vehicle was defective because it lacked relevant warnings. 520 F.3d 237, 245 (3d Cir. 2008). The expert offered an opinion on the vehicle's defective design, and also opined that it lacked adequate instruction and warnings related to the design defect in question. *Id.* The Third Circuit ruled a design expert could testify that providing warnings or instructions was a solution to a safety

engineering problem. *Id.* Specifically, because the testimony about "warnings" was not what the precise language, font, or color should be, but rather, that a proper instruction was a possible solution to an engineering safety problem, the expert was qualified to offer such testimony based on his qualifications as a design expert. *Id.* The *Pineda* court held that an expert does not have to substantively qualify in the drafting of service manuals or instructions in order to offer an opinion about a manufacturer's use of product warnings or instructions to address a design problem; all that is required is a special knowledge of what may cause a defect in a product or machine. *Id.*

Finally, Electrolux's reliance *Donegal Mutual Insurance Co. a/s/o Vanessa Schantz v. Electrolux North America, Inc.*, is misplaced. *See* ECF # 195-6 (attached as Exhibit C to Defendant's Motion). The court in *Schantz* failed to appreciate that Mr. Stoddard is not offering a Human Factors opinion. Moreover, as the court's opinion implies, the plaintiff in that matter largely abandoned its attempt to admit this particular opinion prior to the court's ruling. Finally, that decision was handed down more than 8 years ago. Between then and now, Mr. Stoddard has continued to study clothes dryer design and engineering and has substantially increased his knowledge base through supplemental education, training and experience. That decision is no longer relevant nor representative of Mr. Stoddard's qualifications or the case law surrounding the admissibility of his expert opinion.

ii.     *Mr. Stoddard is qualified to opine that Electrolux lacked formal internal Product Safety standards*

Electrolux next takes issue with four statements made by Mr. Stoddard:

1. "Electrolux has no internal Product Safety standards or training"

2. "Electrolux's engineers failed to make any attempt to reduce the risk of fire in these clothes dryers"

3. "[Electrolux] made no attempt to improve the fire containment properties of

the clothes dryers they manufactured"

4.  "Electrolux was not only negligent in failing to attempt any such engineering improvements, but that they failed to take any action at all"

Exhibit A, Michael Stoddard Report, at 223.  Electrolux contends these are statements about its "internal corporate policies and procedures" and argues that Mr. Stoddard is not qualified to make them because he lacks "formal education in corporate management." Electrolux's argument is nonsensical, none of the statements that it objects to have anything to do with corporate management and, like the statements addressed earlier, are almost entirely factually and derived from Mr. Stoddard's review of the record. Exhibit A, Michael Stoddard Report, at 169-170.

The first statement is based on, among other things, Mr. Stoddard's review of over 50 deposition transcripts of Electrolux's "Safety Engineers." Exhibit A, Michael Stoddard Report, at 170, fn.165. Mr. Stoddard notes that Electrolux's "Safety Engineers" are not actually responsible for validating or improving the dryers' safety, but rather to interact with voluntary standard testing agencies (UL and ANSI) and provide litigation support. Exhibit A, Michael Stoddard Report, at 170. The "Safety Engineers" largely did not interact with design engineers, managers, or other Electrolux personnel to review safety concerns, including dryer fires, or to improve the safety of their products. Exhibit A, Michael Stoddard Report, at 171. He also notes that the "Safety Engineers" associated with Electrolux's ball-hitch dryers had no training, education, or experience in the field of "Safety Engineering" – a specific field of study and practice that involves employing engineering principles to identify and mitigate hazards. Exhibit A, Michael Stoddard Report, at 170-171.

The second, third, and fourth statements reference Electrolux's actions in relation to the above-referenced Hierarchy of Safety Engineering and Product Safety. They are also largely

factual and based on his review of Electrolux's documents and the deposition transcripts of Electrolux employees. Exhibit A, Michael Stoddard Report, at 223. Mr. Stoddard states that Electrolux took no action to mitigate the hazard caused by lint accumulation in proximity the dryers' heat source and made no attempt to improve the dryers' ability to contain a fire despite its awareness of the hazard. Exhibit A, Michael Stoddard Report, at 223. He concludes these inactions did not comport with the Hierarchy of Safety Engineering and Product Safety and therefore breached the standard of care. Exhibit A, Michael Stoddard Report, at 223.

Mr. Stoddard is well-qualified to provide opinions about the applicable standard of care. *See* Exhibit K, Michael Stoddard CV; Exhibit L, Michael Stoddard Affidavit (providing further detail on the safety engineering field and his education and experience in the field). In addition to his experience investigating the design and failures of consumer products, Mr. Stoddard has taken a substantial amount of coursework in pursuit of a Master of Engineering degree in Advanced Safety Engineering and Management. Mr. Stoddard has also spent a significant amount of time studying how general principles of product design and safety engineering are applied within the dryer manufacturer industry. Mr. Stoddard attended a renowned product safety training course offered by Whirlpool and taught by Whirlpool's Product Safety Engineers intended to educate design professionals about the proper application of safety principles to product design. Whirlpool is the industry leader in dryer design and owns the largest share of the dryer market. The course is attended by, among others, product safety engineers from other dryer manufacturers and representatives from UL and the Consumer Product Safety Commission. In addition, Mr. Stoddard has interviewed several safety engineers within the dryer manufacture industry about their company's application of product safety design. *See* Exhibit M, Michael Stoddard Dep. Tr., at 281-283. Finally, Mr. Stoddard is a member of the

UL 2157 Standards Technical Panel responsible for the Standard for Electric Clothes Washers and Extractors (UL 2157) and Electric Clothes Dryers (UL 2158).

Accordingly, Mr. Stoddard has sufficient qualifications to offer opinion testimony at trial about the applicable standard of care and Electrolux's breaches of that standard of care.

### 9.    Response to Defendant's Motion To Preclude Evidence or Argument About Electrolux's Failure to Recall or Retrofit its Dryers (ECF No. 130).

Allstate's Amended Complaint does not assert any independent claims for failure to recall or retrofit. To the extent that certain allegations implicate such failures on Electrolux's part, they are properly included as factual support for Allstate's design, manufacturing or warning defect claims. The cases cited by Electrolux merely hold that Pennsylvania does not recognize independent, stand-alone cause of action for failure to recall or retrofit, not that no such post-sale duty exists. *See e.g. Viguers v. Philip Morris USA, Inc.*, 837 A.2d 534, 541 (Pa. Super. 2003) (dismissing an independent failure to test claim); *Shires v. Celotex Corp.*, No. CIV. A. 85-7141, 1988 WL 1001970, at *2 (E.D. Pa. Mar. 30, 1988) ("Any duty defendants may have had to test their cigarettes would appear to be logically subsumed within plaintiff's defective design or defective manufacture claims."); *Padilla v. Black & Decker Corp.*, No. CIV.A. 04-CV-4466, 2005 WL 697479, at *7 (E.D. Pa. Mar. 24, 2005) (granting summary judgment "*[t]o the extent* that those paragraphs allege a cause of action based on a duty to retrofit or recall.")(emphasis added).

Under Pennsylvania law, a duty to recall or retrofit exists under appropriate circumstances, *i.e.*, when a defect exists at the time of sale and the manufacturer is on notice that it poses a risk. *Lynch v. McStome & Lincoln Plaza Assocs.*, 548 A.2d 1276, 1279 (Pa. Super. 1988) (evaluating whether after reviewing certain evidence, "the jury could reasonably have concluded that Montgomery was on notice after the sale of this escalator that the escalator was

in some way malfunctioning or unsafe, thus giving rise to a post-sale duty to warn or retrofit.");
*see also Talarico v. Skyjack, Inc.*, 191 F. Supp. 3d 394, 399 (M.D. Pa. 2016) (acknowledging
that Pennsylvania does not "impose a post-sale duty on manufacturers to recall or retrofit
products *when the product was not defective at the time of sale*.")(emphasis added). To the
extent that Electrolux argues that Pennsylvania does not recognize a post-sale duty to warn, they
are mistaken. *DeSantis v. Frick Co.*, merely held that "no post-sale duty to warn about
technological advances exists where no defect existed in the product at the time of sale." 745
A.2d 624, 630 (Pa. super. 1999)

Here, the Amended Complaint alleges defects existed at the time of sale and Electrolux
was on notice of a risk to ball-hitch dryer users as a result of such defect. Under these
circumstances, a clear post-sale duty to warn exists under Pennsylvania law. *Walton v. Avco
Corp.*, 610 A.2d 454, 458 (Pa. 1992) (finding that a manufacturer did "have an independent
duty to warn, derived from its knowledge of the defect in the engine."); *Habecker v. Clark
Equip. Co.*, 36 F.3d 278, 287 (3d Cir. 1994). Evidence that Electrolux failed to satisfy its post-
sale duties to recall and/or retrofit a product that knew or should have known was sold in a
defective condition is certainly admissible.

**10.     Response to Defendant's Motion To Preclude Evidence of the Australian
         Thesis (ECF No. 126).**

Evidence of the Australian Thesis is relevant under Rule 401 to show the feasibility of
safer design alternatives. Under the risk utility test of Pennsylvania strict liability law, a jury
can weigh evidence of "[t]he availability of a substitute product which would meet the same
need and not be as unsafe . . . [and] . . . [t]he manufacturer's ability to eliminate the unsafe
character of the product without impairing its usefulness or making it too expensive to maintain
its utility. *Tincher*, 104 A.3d at 389-90. Moreover, Allstate's suit also sounds in negligence.

Electrolux can be considered negligent if they knew of a feasible design alternative but failed to utilize it.

The Australian Thesis shows the bulkhead design is a feasible and safer design alternative and that Electrolux knew it was a feasible and safer design alternative. Allstate contends that each of the eight fires at issue here were entirely preventable. Compared to a ball-hitch style dryer, a "bulkhead" style design is far more likely to prevent lint from accumulating near the heat source and subsequently igniting. *See* Exhibit A, Michael Stoddard Report, at 57-64, 94, 165-169. This was common knowledge in the industry since the 1960s. The bulkhead design has long been the dominant design style on the market.  It accounted for over 70% of the market in 1994 and now accounts for an estimated 95% of the market.  *See* Exhibit A, Michael Stoddard Report, at 166.

Electrolux was familiar with the bulkhead design from at least the late 1980s. In 2006, Electrolux designed a bulkhead style dryer – termed the "Common Platform Dryer" – for manufacture and sale in its Australian market. With the full support of Electrolux's Swedish parent company, AB Electrolux, and another Australian Electrolux entity, two Swedish scientists completed a master's thesis, studying the fire hazards related to lint accumulation in Electrolux's bulkhead style Common Platform Dryer. *See* Exhibit N, Australia Thesis, at pp. ii-iii, 14 (to be filed under seal). The thesis indicates that Electrolux's bulkhead design was specifically developed to reduce the risk of accumulating lint and catching fire as compared to its antecedent ball-hitch style dryer. *Id.* at ii. The thesis concludes that the bulkhead design poses less of a fire hazard than the ball-hitch design.

The Australian Thesis also shows that an audible and/or visual warning is a safer and feasible design alternative compared to warnings or instructions in product literature. The

Thesis notes that reduced airflow increases the risk of hazardous lint accumulation and that the failure to clean the lint screen decreases airflow. The Thesis notes that warnings contained in product literature are largely ineffective to change consumer behavior. *Id.* at 8-9. To combat reduced airflow and increase consumer compliance with manufacturer instructions, the Thesis tested the feasibility of using a buzzer tied to the dryers' thermal cut-out thermostat to alert the user that their lint screen was full and airflow was reduced. *Id.* at 41-44. The Thesis recommended installing the buzzer tied to the thermal cut-out thermostat along with an accompanying warning light to let the user know its dryer is suffering from reduced airflow and is a fire hazard. *Id.* at 49. This is similar to warning system design alternatives proposed by Allstate's experts. *See* Exhibit A, Michael Stoddard Report, at 106-126 (discussing audible and visual warnings to consumers about reduced airflow and a thermal limiter); Exhibit B, Dr. William Vigilante Report, at 32, 33, 39, 65-69 (discussing audible and visual warnings to consumers about reduced airflow and a thermal limiter).

Introduction of the Australian Thesis is not prejudicial to Electrolux and will not mislead or confuse the jury under Rule 403. Electrolux's claims of prejudice all arise from its mistaken belief that the relevance of the Australian Thesis is based on reported incidents of prior ball-hitch dryer fires. The Australian Thesis is not relevant to establish that prior incidents of lint accumulation fires occurred, accordingly, Plaintiffs do not need to establish the "substantially similar" foundation, as alleged by Electrolux. Again, the relevance is to show that alternative designs were feasible and safer and that Electrolux knew or should have known that they were safer. For that reason, Electrolux's claims of prejudice and undue delay are unfounded.

The Australian Thesis is admissible hearsay. Portions of the Australian Thesis will be introduced into evidence by Allstate's experts who are allowed to rely on and testify to

inadmissible hearsay under Federal Rule of Evidence 703. Exhibit C, Dr. William Vigilante Report, at 32, 33, 39 (relying on the Australian Thesis). In addition, the Australian Thesis is a learned treatise, from which Allstate's experts can read portions into the evidence under Federal Rule of Evidence 803(18).

**11.    To Preclude Evidence Relating to Electrolux's Webster City, Iowa and Juarez, Mexico Manufacturing Plants (ECF No. 132).**

Evidence that Electrolux abandoned its ball-hitch design manufactured in Webster City, Iowa and began manufacturing a safer bulkhead design in Juarez Mexico is relevant because it provides the jury with context. The jury has a right to know that Electrolux stopped building the defective design long before any of these fires occurred, subsequently demolished the plant, lost or destroyed records that should have been preserved pursuant to internal policies and litigation holds that concerned ball-hitch dryer testing and safety, and fired all of the employees who designed and produced the ball-hitch dryers. The jury has the right to infer from this conduct that Electrolux knew its dryer was defective and sought to cut all ties with the failed design as efficiently as possible.

Electrolux's claims of "unfair prejudice" are unfounded. This evidence is not being offered to suggest that Electrolux is a bad actor because it moved its manufacturing to foreign country to save money. The evidence is being offered to prove Electrolux did everything in its power to conceal the defective condition of its bad design. The evidence is probative of Electrolux's state of mind as well as Electrolux's conscious disregard to the rights and safety of consumers. Electrolux fails to explain how this evidence is unfairly prejudice, never mind how its probative value is substantially outweighed by any danger of unfair prejudice, and therefore Electrolux's motion to preclude same must be denied.

IV.   <u>**Conclusion**</u>

    For the reasons stated above, Electrolux's Motion must be denied.

                     **de LUCA LEVINE, LLC**

                 **BY:**  <u>Patrick A. Hughes</u>

                     RAYMOND E. MACK, ESQUIRE
                     P.A. ID No. 91815 rmack@delucalevine.com
                     PATRICK A. HUGHES, ESQUIRE
                     P.A. ID No. 91415 phughes@delucalevine.com
                     Three Valley Square, Suite 220
                     Blue Bell, PA  19422
                     215-383-0081 (Main) / 215-383-0082 (fax)
                     ATTORNEYS FOR PLAINTIFFS

Date:  <u>January 15, 2019</u>