**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE INDEMNITY COMPANY; ALLSTATE PROPERTY & CASUALTY INSURANCE COMPANY; ALLSTATE VEHICLE & PROPERTY INSURANCE COMPANY | : : : : : | NO. 5:16-cv-04276-EGS |
| v. | : : | JURY TRIAL DEMANDED |
| ELECTROLUX HOME PRODUCTS, INC. | : | |

**DEFENDANT, ELECTROLUX HOME PRODUCTS, INC.'S MEMORANDUM OF LAW
IN SUPPORT OF OPPOSITION TO PLAINTIFFS' OMNIBUS MOTION IN LIMINE
TO PRECLUDE CERTAIN EXPERT TESTIMONY**

Defendant, Electrolux Home Products, Inc. ("Electrolux"), by and through its counsel, Nicolson Law Group LLC, files the within Memorandum of Law in Support of its Opposition to Plaintiffs' Omnibus Motion in limine to preclude certain expert testimony ("Allstate's Motion") from Electrolux's experts, Frank Schwalje, P.E. and Kenneth M. Garside, P.E. at trial. As discussed at length below, none of Allstate's requests to limit the testimony of Electrolux's experts have any merit and should be denied. Electrolux respectfully requests oral argument.

## I.    STATEMENT OF THE FACTS

This lawsuit is a subrogation action in which the Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company; Allstate Property & Casualty Insurance Company and Allstate Vehicle & Property Insurance Company ("Allstate"), seek recovery from Electrolux as a result of 8 unrelated fires at their insureds' homes involving 8 different dryers as follows:

| Insured: | Identification of dryer: | Date of loss: |
|---|---|---|
| Brunilda & Anselmo Almodovar | Frigidaire brand, free-standing electric dryer Model No. FER6600FS0 Serial No. XD70810247 DOM: February 2007 | March 24, 2016 |

| Rachel Bullene d/b/a Mamselle Salon | Kenmore brand, gas laundry center<br>Model No. 417.97972701<br>Serial No. XE81902320<br>DOM: April 2008 | December 20, 2014 |
|---|---|---|
| Cynthia & Benson Christie | Frigidaire brand, free-standing gas dryer<br>Model No. GLGR1042FS0<br>Serial No. XD7210712<br>DOM: May 2007 | April 10, 2016 |
| Robert & Delores Gray | Kenmore brand, free-standing electric dryer<br>Model No. 417.83142201<br>DOM: September 2003 | November 4, 2014 |
| Gerry & Elizabeth Gutierrez | Frigidaire brand, free-standing gas dryer<br>Model No. GLGQ332AS2<br>DOM: February 2003 | December 16, 2012 |
| Jennifer & Daniel Quinn | Frigidaire brand, free-standing electric dryer<br>Model No. GLER642AS3<br>Serial No. XD428008__<br>DOM: July 2004 | November 20, 2014 |
| Greg & Salome Venbrux | Frigidaire brand, free-standing gas dryer<br>Model No. GLGR331AS4<br>Serial No. XD4112294<br>DOM: March 2004 | October 26, 2014 |
| Marc & Lisa Weiss | Kenmore brand, free-standing gas dryer<br>Model No. 417.93142202<br>DOM: June 2003 | October 16, 2015 |

Allstate alleges that all Electrolux ball-hitch dryers are defective in design and warnings. Lint is a natural by-product of the laundering process and literature is widely disseminated that fires can occur when lint builds up in the dryer and/or venting. Fires are a risk for all clothes dryers if the dryer is not properly installed, used or maintained. In 2007, the U.S. Fire Administration reported that there were 12,700 clothes dryer fires annually that occurred in residential buildings in the U.S. and that the leading cause of those dryer fires was the owner's failure to clean. Lint buildup and the need for cleaning the dryer and venting are common to all dryers. This is the very reason why Electrolux and other dryer manufacturers instruct their customers to clean their dryers and venting at regular intervals. Further, almost every residential insurance company, including

Allstate, provides instructions to its insureds for the proper maintenance and cleaning of their dryers to avoid the risk of fire.

The design of the subject dryers provides for proper airflow necessary to exhaust lint created during the drying process when the dryers are installed, used and maintained in accord with Electrolux's instructions. With proper installation, use and maintenance, lint does not accumulate in hazardous amounts in the dryer or external venting.  Reduced airflow caused by improper installation, use and maintenance results in increased lint accumulation in the dryer and venting.

Standards have been put in place to prevent or reduce the very small, but well-known risk of fires in dryers.  The dryers at issue in this matter were designed, manufactured and tested in accord with the voluntary safety standards set forth in UL 2158 (electric dryers) and ANSI Z21.5.1 (gas dryers).  The subject dryers were accompanied with clear warnings and instructions for installation, use and maintenance to prevent excess lint accumulation and the risk of fire.

Electrolux retained Mr. Schwalje and Mr. Garside to provide an engineering analysis and evaluation of the subject fires as they relate to the subject dryers.  Mr. Schwalje examined the Bullene, Christie and Weiss dryers and Mr. Garside examined the Almodovar, Gray, Gutierrez, Quinn and Venbrux dryers.  Mr. Schwalje and Mr. Garside issued separate reports memorializing their investigations and opinions with regard to each of the subject fires.  *See* Exhibit H (Almodovar – Garside Report), Exhibit I (Bullene – Schwalje Report), Exhibit J (Christie – Schwalje Report), Exhibit K (Gray – Garside Report), Exhibit L (Gutierrez – Garside Report), Exhibit M (Quinn – Garside Report), Exhibit N (Venbrux – Garside Report) and Exhibit O (Weiss – Schwalje Report), attached to Allstate's Motion and filed under seal.

## II.   LEGAL ARGUMENT

### A.   Standard for Admissibility of Expert Testimony

Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify . . . if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  Under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993).  This obligation has been likened to a "gatekeeping role". *Daubert*, 509 U.S. at 597.  As the Third Circuit has explained, the requirements of Rule 702 represent the "trilogy of restrictions on expert testimony: qualification, reliability and fit." *Calhoun v. Yamaha Motor Corp. U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (citation omitted).

When considering the reliability requirement, the gatekeeping function requires the trial court to "make certain that an expert, whether basing testing upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  To satisfy this requirement, "a litigant has to make more than a prima facie showing that his expert's methodology is reliable . . . [but] the evidentiary requirement of reliability is lower than the merits standard of correctness." *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008).

The Supreme Court set forth factors that may be considered in evaluating the reliability of a witness' methodology:  (1) whether the theory or technique can be or has been tested; (2) whether

the theory has been subjected to peer review and publication; (3) the known or potential rate of error; (4) whether the technique's operation is subject to standards governing its application; and (5) the general acceptance within the relevant scientific community.  *See Daubert*, 509 U.S. at 593-94.  In some cases, "the relevant reliability concerns may focus upon personal knowledge or experience."  *Betterbox Commc'n Ltd. v. BB Technologies, Inc.*, 300 F.3d 325, 329 (3d Cir. 2002) (quoting *Kumho*, 526 U.S. at 149-50).

"*Daubert* is a rule of flexibility, liberally construed to allow admissibility of expert testimony . . .  Exclusion of expert testimony is the exception rather than the rule . . . ."  *Keller v. Feasterville Family Health Care Ctr.*, 557 F. Supp. 2d 671, 674 (E.D. Pa. May 29, 2008).  "If an expert's testimony rests on 'good grounds . . . it should be tested by the adversary process – competing expert testimony and active cross-examination – rather than excluded from jurors' scrutiny for fear that they will not grasp its complexities or satisfactorily weigh its inadequacies."  *Id*. at 676 (citations omitted).  "Vigorous cross examination  . . . is 'beyond any doubt the greatest engine ever invented for discovery of truth.'"  *Id.* (citations omitted).

The final requirement is fit, which means "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact."  *Calhoun*, 350 F.3d at 321 (citation omitted). The court's discretion and gate-keeping duties should be tempered by the liberal thrust of the Federal Rules of Evidence.  "[N]ot only do the Rules of Evidence generally 'embody a strong preference for admitting any evidence that may assist the trier of fact,' but Rule 702 specifically has a liberal policy of admissibility.'"  *Dalton v. McCourt Elec. LLC*, 112 F. Supp. 3d 320, 325 (E.D. Pa. July 7, 2015) (citation omitted).  "The Rules of Evidence embody a strong preference for admitting any evidence that may assist the trier of fact."  *Pineda*, 520 F.3d at 243; see also Fed. R. Evid. 401 (defining "relevant evidence" to mean "evidence having any tendency to make the

existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."); *Alpha Pro Tech, Inc. v. VWR Int'l, LLC*, 2016 U.S. Dist. LEXIS 141030, at \*20 (E.D. Pa. Oct. 11, 2016) ("The hurdle that the proponent of expert testimony must overcome is not particularly high and exclusion of expert testimony is typically the exception and not the rule."); *Krock v. U.S.*, 2015 U.S. Dist. LEXIS 100121, at \*8 (E.D. Pa. July 31, 2015) ("The Federal Rules of Evidence embody a strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact.") (citation omitted).

    **B.**    **The Opinions and Testimony from Mr. Schwalje and Mr. Garside Amply Satisfy the Standard for Admissibility under the Federal Rules of Evidence and *Daubert*.**

Mr. Schwalje and Mr. Garside are highly credentialed engineers and are fully qualified to render expert opinions in this matter regarding the subject dryers.

Mr. Schwalje graduated from the Pratt Institute in New York in 1969 with a Bachelor of Science degree in mechanical engineering.  *See* Exhibit A - Frank Schwalje, P.E.'s Curriculum Vitae.  Mr. Schwalje obtained a Master of Science degree from the New Jersey Institute of Technology in 1988.  *See id*.  Mr. Schwalje is a licensed engineer in three states and is a Certified Fire & Explosion Investigator (CFEI).  *See id*.  Throughout his career, Mr. Schwalje has investigated numerous fires involving dryers manufactured by Electrolux and other manufacturers.

Mr. Garside graduated from Rutgers University in 1980 with a Bachelor of Science degree in mechanical engineering.  *See* Exhibit B - Kenneth M. Garside, P.E.'s Curriculum Vitae.  Mr. Garside obtained a Master of Science – Engineering Science degree in Safety Engineering and Construction Management from the New Jersey Institute of Technology in 1998.  *See id*.  Mr. Garside is a licensed engineer in three states and is a Certified Fire & Explosion Investigator

(CFEI).  *See id.*  Throughout his career, Mr. Garside has investigated numerous fires involving dryers manufactured by Electrolux and other manufacturers.

Mr. Schwalje and Mr. Garside have testified in both federal and state courts in product liability cases and have never had their testimony limited or excluded.  Their expertise on a variety of engineering matters has been recognized by many courts.  They have extensive experience investigating the origin and cause of fires involving dryers and have inspected numerous Electrolux dryers and dryers manufactured by other companies.  Accordingly, this Court should find that Mr. Schwalje and Mr. Garside are qualified by their specialized knowledge, skill, experience, training and education to offer expert opinions in this matter.

Mr. Schwalje and Mr. Garside's opinions in this matter are offered to a reasonable degree of engineering certainty and are based upon their inspections of the subject dryers and attached venting (where available)[1], file material reviewed, review of applicable codes and standards and their knowledge and industrial and consulting experience and application of the scientific method.

Pursuant to Rule 702 and *Daubert*, this Court should permit Mr. Schwalje and Mr. Garside to testify if it makes the following determinations as to their qualifications and the reliability and fit/helpfulness of their opinions and testimony: (1) Mr. Schwalje and Mr. Garside are qualified as experts by their specialized knowledge, skill, experience, training, and/or education regarding the subject matter of their testimony; (2) their opinions and testimony relate to matters beyond the knowledge or experience possessed by lay persons; and (3) their opinions and testimony are based on reliable scientific, technical, or other specialized information applied to the case facts in a

---

[1] On January 8, 2019, Electrolux filed a Motion requesting that this Honorable Court issue a jury instruction on the spoliation inference relative to five of the eight claims in this matter – Almodovar, Bullene, Gray, Quinn and Venbrux. In each of these claims, Allstate's fire investigators failed to preserve aspects of the fire scene and as a result, Electrolux's experts were prevented from analyzing items relevant to their investigation into the cause of the fires.

reliable manner.  *See* Fed. R. Evid. 702; *see also* Fed. R. Evid. 104(a).  The record fully supports

a finding that all three requirements of qualifications, reliability and fit/helpfulness exist here.

> **C.**     **Mr. Schwalje and Mr. Garside should be permitted to testify about the propriety of Electrolux's dryer design process as the design of the subject dryers conformed to the applicable industry standards and should be permitted to testify about safety monitoring.**

Allstate argues unpersuasively and without citation to any legal authority that Mr. Schwalje

and Mr. Garside are not qualified to provide expert testimony regarding the propriety of

Electrolux's design process and safety monitoring.  *See* Allstate's Motion at 7.  To the contrary,

they are both qualified to offer testimony on these topics and their testimony is based on their

independent analysis of the subject dryers and attached venting (where available), photographs

and measurements taken at the fire scene (where available), deposition testimony, voluminous

documents produced in discovery concerning the design, testing and manufacture of the subject

dryers by Electrolux, various industry literature and standards, and testing and studies and their

knowledge, training, education and experience as engineers.  Their opinions will be helpful to the

trier of fact because their testimony relates to matters that are not within the knowledge or

experience possessed by lay persons.  They will be the only experts the jury will hear from with

education and experience as engineers.

They are highly credentialed engineers and are fully qualified to render expert opinions in

this matter regarding the design of the subject dryers.  *See* Section II, B. *supra* (providing a detailed

discussion of Mr. Schwalje and Mr. Garside's qualifications.  The Court should find that Mr.

Schwalje and Mr. Garside are qualified as experts by their specialized knowledge, skill,

experience, training and education.

"The Third Circuit has interpreted Rule 702's qualification requirement liberally."

*Connerarney v. Main Line Hosps., Inc.*, 2016 U.S. Dist. LEXIS 153143 (E.D. Pa. Nov. 4, 2016)

(citing *Pineda*, 520 F.3d at 243). "In fact, a broad range of knowledge, skills, and training can qualify a witness as an expert." *Id.* (citation omitted). "And it is an abuse of discretion to exclude expert testimony simply because the trial court does not deem the proposed expert to be the best qualified or because the proposed expert does not have the specialization that the court considers most appropriate." *Id.* (citation omitted).

Accordingly, the Court should find that Mr. Schwalje and Mr. Garside are qualified provide expert testimony regarding the propriety of Electrolux's dryer design process and safety monitoring.

> **D.    Mr. Schwalje and Mr. Garside should be permitted to testify that the subject dryers were "reasonably safe" for their intended use.**

Following their examination and review of the subject dryers and attached venting (where available), photographs and measurements taken at the fire scene (where available), deposition testimony, voluminous documents produced in discovery concerning the design, testing and manufacture of the subject dryers, various industry literature and standards, and testing and studies, Mr. Schwalje and Mr. Garside opined that the subject dryers are "reasonably safe" for their "intended use when installed, operated and maintained in accordance with the manufacturer's instructions." *See* Exhibit H (Almodovar Report) at 54, Exhibit I (Bullene Report) at 56, Exhibit J (Christie Report) at 54, Exhibit K (Gray Report) at 53, Exhibit L (Gutierrez Report) at 48, Exhibit M (Quinn Report) at 51, Exhibit N (Venbrux Report) at 50 and Exhibit O (Weiss Report) at 54, attached to Allstate's Motion and filed under seal. The facts and data relied on by Mr. Schwalje and Mr. Garside are similar to the facts and data relied upon by Allstate's expert, Michael Stoddard, and are the sorts of facts and data that an expert in the field of dryer fire investigations would rely upon.

Allstate seeks to preclude Mr. Schwalje and Mr. Garside's opinion that the subject dryers are "reasonably safe" because their opinion is irrelevant to determining whether a product is defective under Pennsylvania law, does not help the jury understand any fact or issue in the case and is prejudicial because it will likely mislead and confuse the jury.  *See* Allstate's Motion at 10. Each argument lacks merit and is addressed below.

       1.    Mr. Schwalje and Mr. Garside's opinion that the subject dryers are "reasonably safe" is relevant.

Allstate contends that the subject dryers are "unreasonably dangerous" that is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer."  *See* Allstate's Amended Complaint, at ¶¶45(p) and 53(t) (Doc. 26).  Further, Allstate's expert contends that the design and warnings of the subject dryers are "unreasonably dangerous".  *See* Exhibit P - Report of Michael Stoddard at 7 and 10.  Mr. Schwalje and Mr. Garside's opinion that the subject dryers were "reasonably safe" is directly relevant to Electrolux's defense in light of Allstate's broad-ranging allegations of negligent design/warnings and strict products liability.

In their reports, Mr. Schwalje and Mr. Garside provide a detailed explanation for basis for their conclusion that the subject dryers are "reasonably safe"[2].  *See* Exhibit H (Almodovar –

---

[2] In their expert reports issued in this matter, Mr. Schwalje and Mr. Garside articulated their basis for "reasonably safe" as follows: (1) The subject dryers met the nationally recognized consensus standards for gas dryers (ANSI Z21.5.1) and for electric dryers (UL 2158).  (2) "The lint accumulation observed in the Webster City Lint Accumulation Testing does not substantiate a claim that lint accumulates to an unreasonably hazardous level in a properly installed, operated and periodically cleaned [dryer] at the 18-month interval . . . . No lint fires occurred during the Webster City Lint Accumulation Testing or the Webster City Life Cycle Testing." (3) Mr. Schwalje and Mr. Garside have not observed during their "performance of Electrolux dryer fire causation analysis any dryer having sustained fire unless improperly installed and/or maintained.  In particular, a fire has not been observed when the dryer cabinet and venting was cleaned within 18 months of the fire."  (4) "The Electrolux dryer claims database does not support Plaintiffs' allegations that Electrolux ball-hitch dryers cause fires at an 'epidemic' level.  Plaintiffs have provided no quantitative analysis to substantiate its claim that the Electrolux ball-hitch fire incident rates exceed that of any other manufacturer's dryer.  It is accepted that residential clothes dryers are susceptible to fire.  If a dryer and its vent system is not maintained through periodic cleaning, lint will build-up and the probability of a fire occurring will increase."  (5) "The subject dryer model line has been successfully sold in the US since its introduction in or about 1998 until it was discontinued in or about 2011."  (6) The basis for "Reasonably Safe" is based upon Mr. Schwalje and Mr. Garside's "inspections and review of the file material, applicable and relating codes and standards, technical material" and "their education, work experience and personal experience with this product."

Garside Report) - Appendix E, Exhibit I (Bullene – Schwalje Report) - Appendix F, Exhibit J

(Christie – Schwalje Report) – Appendix F, Exhibit K (Gray – Garside Report) – Appendix E,

Exhibit L (Gutierrez – Garside Report) – Appendix F, Exhibit M (Quinn – Garside Report) –

Appendix E, Exhibit N (Venbrux – Garside Report) – Appendix F and Exhibit O (Weiss –

Schwalje Report) – Appendix F, attached to Allstate's Motion and filed under seal.  In part, their

conclusion is based on the fact that the subject gas dryers (Bullene, Christie, Gutierrez, Venbrux

and Weiss) met the nationally recognized consensus standard for gas clothes dryers – ANSI

Z21.5.1 and that the subject electric dryers (Almodovar, Gray and Quinn) met the nationally

recognized consensus standard for electric clothes dryers – UL 2158.

Allstate argues that compliance with industry standards is irrelevant to the determination

of whether a product is unreasonably dangerous and evidence of compliance with industry

standards is inadmissible in a strict liability action.  Allstate does not dispute that compliance with

industry standards is admissible as to Allstate's negligence claim.

> a.   Compliance with industry standards is relevant and is therefore
>       admissible.

Evidence is admissible if it is relevant; that is, if it has any tendency to make the existence

of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence.  *See* Fed. R. Evid. 401; *see also Terry v. McNeil-PPC, Inc.*,

No. 2:12-cv-07263, 2016 U.S. Dist. LEXIS 72774, at *3 (E.D. Pa. June 3, 2016).  Relevant

evidence logically tends to prove or disprove a material fact.  *See Wright v. Montgomery County*,

No. 96-4597, 1998 U.S. Dist. LEXIS 19162, at **19-20 (E.D. Pa. Dec. 3, 1998); *Domenico v.

Colonial Used Auto Sales, Inc.*, No. 3:15-0530, 2016 U.S. Dist. LEXIS 133929, at *26 (M.D. Pa.

Sept. 29, 2016) (citing Fed. R. Evid. 402).  Consequential evidence that is logically related to a

party's claim is relevant. *See Gumbs v. International Harvester, Inc.*, 718 F.2d 88, 97 (3d Cir. 1983).

Compliance with the standards set forth in ANSI Z21.5.1 and UL 2158 helps a manufacturer produce a safe product.  Indeed, as noted in the Preface section of ANSI Z21.5.1:

> This publication represents a basic standard for safe operation, substantial and durable construction, and acceptable performance of gas type one clothes dryers. It is the result of years of experience in the manufacture, testing, installation, maintenance, inspection and research on gas clothes dryer's design for utilization of gas. There are risks of injury to persons inherent in appliances that, if completely eliminated, would defeat the utility of the appliance. The provisions in this standard are intended to help reduce such risks while retaining the normal operation of the appliance.

*See* Exhibit I (Bullene – Schwalje Report) - Appendix F, Exhibit J (Christie – Schwalje Report) – Appendix F, Exhibit L (Gutierrez – Garside Report) – Appendix F, Exhibit N (Venbrux – Garside Report) – Appendix F and Exhibit O (Weiss – Schwalje Report) – Appendix F, attached to Allstate's Motion and filed under seal.  In addition, in part, UL 2158 provides the following:

> This Standard contains basic requirements for products covered by Underwriters Laboratories Inc. (UL) under its Follow-Up Service for this category within the limitations given below and in the Scope section of this Standard.  These requirements are based upon sound engineering principles, research, records of tests and field experience, and an appreciation of the problems of manufacture, installation, and use derived from consultation with and information obtained from manufacturers, users, inspection authorities, and others having specialized experience.  They are subject to revision as further experience and investigation may show is necessary or desirable.

*See* Exhibit H (Almodovar – Garside Report) - Appendix E, Exhibit K (Gray – Garside Report) – Appendix E and Exhibit M (Quinn – Garside Report) – Appendix E, attached to Allstate's Motion and filed under seal.

Allstate contends that the subject dryers are "unreasonably dangerous" that is "dangerous to an extent beyond that which would be contemplated by the ordinary consumer." *See* Allstate's Amended Complaint, at ¶¶45(p) and 53(t) (Doc. 26). Electrolux's compliance with the standards set forth in ANSI Z21.5.1 and UL 2158 is relevant to its defense in light of Allstate's broad-ranging allegations negligent design/warnings and strict products liability.

The dissent in *Lewis v. Coffing Hoist Div., Duff-Norton Co.*, 528 A.2d 590 (Pa. 1987) "opined that industry standards are written by specialized individuals with knowledge of product design superior to that of courts and, as a result, **evidence of such standards is relevant to the question of defect**," and "that evidence of industry standards was admissible although not necessarily highly probative." *Tincher*, 104 A.3d 328, 369 (Pa. 2014) (emphasis supplied). As further pointed out by the *Lewis* dissent, "industry standards may make the likelihood that a manufacturer acted reasonably more probable by showing that those actions were endorsed by 'specialized individuals with knowledge of product design superior to that of courts.'" *Sliker v. Nat'l Feeding Sys., Inc.*, 2015 WL 6735548, at *21 (Pa. C.P. Clarion Co. Oct. 19, 2015). The Court in *Cloud v. Electrolux Home Products, Inc.* held that evidence of Electrolux's compliance with the requirements of ANSI Z21.5.1, "while not dispositive, . . . it is relevant and probative given the *post hoc* evaluation of a manufacturer's conduct that *Tincher* invites, even in strict liability cases." *Cloud*, 2017 WL 3835602, at *2 (E.D. Pa. Jan. 16, 2017).

Accordingly, evidence of Electrolux's compliance with ANSI Z21.5.1 and UL 2158 is relevant in this case.

          b.    Compliance with industry standards is admissible in this strict products liability action.

The continued vitality of the prohibition on industry standards evidence is in question post-*Tincher v. Omega Flex, Inc.*, 104 A.3d 328, (Pa. 2014). Before the *Tincher* decision, in *Lewis v.*

*Coffing Hoist Div., Duff-Norton Co.*, 528 A.2d 590 (Pa. 1987), the Court held that evidence of a product's compliance with industry standards was inadmissible in a strict products liability action. The holding in *Lewis* was based on *Azzarello v. Black Bros. Co.*, 391 A.2d 1020 (Pa. 1978), which was explicitly overruled by *Tincher*. *See Tincher*, 104 A.3d at 376.

The Court in *Tincher* noted that after "*Azzarello*, decisional focus in strict liability cases shifted to reflect an increasing concern with segregating strict liability and negligence concepts." *Id.* at 367. Most notably, the Court indicated that this "segregation" prompted exclusion of industry standards as "negligence" evidence, citing to *Lewis*, as well as evidence of mandatory government standards and comparative negligence. The Court further advised that "the decision to overrule *Azzarello* . . . may have an impact . . . upon subsidiary issues constructed from *Azzarello*, such as the availability of negligence-derived defenses." *Id.* at 409.

The *Tincher* Court articulated new standards for determining whether a product will be found to be "defective" under Pennsylvania law. Specifically, the Court held that:

> [I]n Pennsylvania, the cause of action in strict products liability requires proof, in the alternative, either of the ordinary consumer's expectations or of the risk-utility of a product. To maintain the integrity and fairness of the strict products liability cause of action, each part of this standard of proof remains subject to its theoretical limitations.

*Id.* at 401. The *Tincher* Court explained that under the consumer expectation test, "the product is in a defective condition if the danger is unknowable and unacceptable to the average or ordinary consumer." *Id.* at 387. "The nature of the product, the identity of the user, the product's intended use and intended user, and any express or implied representations by a manufacturer or other seller are among considerations." *Id.* (citations omitted). Limitations of the consumer expectation test are: (1) "obvious dangers" exempt products from liability; and (2) the test becomes "arbitrary" if

14

applied to "complex" products "whose danger is vague or outside the ordinary consumer's contemplation." *Id.* at 401-02.

The "risk/utility" standard involves a "test balancing risks and utilities or, stated in economic terms, a cost-benefit analysis." *Id.* at 389. The Court noted that "[t]he risk-utility test offers courts an opportunity to analyze post hoc whether a manufacturer's conduct in manufacturing or designing a product was reasonable, which obviously reflects the negligence roots of strict liability." *Id.* This statement directly contradicts the principles articulated in *Lewis*. In choosing between these two theories in any given case, the Court recognized that "the theory of strict liability as it evolved overlaps in effect with the theories of negligence and breach of warranty." *Id.* at 401. It "combin[es] the balancing of interests inherent in those two causes of action." *Id.* It follows that the holding in *Lewis*, based on *Azzarello*, and the then-impermissible comingling of negligence and strict liability concepts, conflicts with *Tincher*'s pronouncement that a manufacturer's conduct and reasonableness is relevant to the determination of a product defect.

While no Pennsylvania appellate court has yet confronted the *Lewis* exclusion directly, numerous post-*Tincher* Pennsylvania decisions have held that the *Lewis* exclusion expired with *Azzarello* and support the admissibility of a product's compliance with industry standards at trial. *See Vitale v. Electrolux Home Products, Inc.*, 2018 WL 3868671, at *3 (E.D. Pa. Aug. 14, 2018) ("*Tincher* blurred the bright line demarcation between negligence theories and strict products liability . . . in favor of the admissibility of evidence of compliance with industry standards to defend against strict liability claims") (citation and quotation marks omitted); *Cloud v. Electrolux Home Products, Inc.*, 2017 WL 3835602, at *2 (E.D. Pa. Jan. 16, 2017) ("After *Tincher*, courts should not draw a bright line between negligence theories and strict liability theories regarding evidence of industry standards"); *Rapchak v. Haldex Brake Products Corp.*, 2016 WL 3752908,

at*3 (W.D. Pa. July 14, 2016) ("the principles of *Tincher* counsel in favor of [the] admissibility of compliance with "industry or government standards"); *Mercurio v. Louisville Ladder, Inc.*, 2018 WL 2465181, at *7 (M.D. Pa. May 31, 2018) (following *Cloud* and *Rapchak*); *Sliker v. Nat'l Feeding Sys., Inc.*, 2015 WL 6735548, at *7 (Pa. C.P. Clarion Co. Oct. 19, 2015) (industry standards evidence admissible as "particularly relevant to factor (2)" of Tincher's risk/utility approach).

Allstate cites to *Dunlap v. Fed. Signal Corp.*, 194 A.3d 1067 (Pa. Super. 2018) to support its position that evidence of compliance with industry standards is inadmissible in a strict liability action. However, *Dunlap* did not decide the question of whether evidence of compliance with industry standards is admissible in a strict liability action. In *Dunlap*, the primary question was whether evidence that an alternative design met industry standards was sufficient to prove its effectiveness for all users under the risk-utility test. *See Dunlap*, 194 A.3d at 1073 ("Maher and Roell's proof that their proposed design met the industry standard was not enough to establish a *prima facie* case that it was more effective for all users than the Q-siren.").

Accordingly, evidence that the subject gas dryers complied with ANSI Z21.5.1 and evidence that the subject electric dryers complied with UL 2158 is admissible in this case.

> 2. Mr. Schwalje and Mr. Garside's opinion that the subject dryers are "reasonably safe" is helpful to the jury.

The Court should reject Allstate's contention that Mr. Schwalje and Mr. Garside's opinion that the subject dryers are "reasonably safe" does not "fit". The "fit" requirement means "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp. U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (citation omitted). Mr. Schwalje and Mr. Garside's opinion will be helpful to the trier of fact because it relates to matters

that are not within the knowledge or experience possessed by lay persons.  They will be the only experts the jury will hear from with education and experience as engineers.

Further, their opinion that the subject dryers are "reasonably safe" indisputably involves an issue of a technical nature.  It is routinely recognized by courts across the country that testimony by qualified individuals such as Mr. Schwalje and Mr. Garside will aid the trier of fact in its "search for the truth."  *See, e.g., Maryland Cas. Co. v. Thermo-D-Disc, Inc.*, 137 F.3d 7880, 785-86 (4th Cir. 1998) (affirming admission of testimony of electrical engineer in dryer fire case where witness had previously testified in similar case, and his opinion was based upon his examination of the device, experience, application of technical principles and citation of technical literature).

In *Vitale v. Electrolux Home Products, Inc.*, the Vitales (Allstate was the subrogating insurance carrier) sought to exclude Electrolux's expert, Randall E. Bills, P.E., who opined, in part, that the gas dryer at issue in that case was "reasonably safe for its intended use".  *See Vitale*, 2018 WL 3868671 (E.D. Pa. Aug. 14, 2018).  Like in this case, the Vitales challenged the "fit" of Mr. Bills' opinions.  The Vitales also challenged the reliability of Mr. Bills opinions.  It is interesting to note that in this case, Allstate does not challenge the reliability of Mr. Schwalje and Mr. Garside's opinions in this case.  Judge Lloret denied the Vitale's Motion finding that Mr. Bills' conclusions would "undeniably be useful to a trier of fact".

Accordingly, the Court should find the Mr. Schwalje and Mr. Garside's opinion satisfies the requirement that it be helpful to the trier of fact.

> 3.    Mr. Schwalje and Mr. Garside's opinion that the subject dryers are "reasonably safe" will not mislead or confuse the jury.

Although relevant, evidence may be precluded if its probative value is outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury, or by consideration of undue delay, waste of time, or needless presentation of cumulative evidence.  *See* Fed. R. Evid.

403.  The function of the district court is to balance the alleged prejudicial effect of the evidence against its probative value.  *See Medina v. Rose Art Industries*, No. 2:02-CV-1864, 2003 U.S. Dist. LEXIS 3203, at *13 (E.D. Pa. Feb. 28, 2003) (internal citations omitted).

Allstate contends that Mr. Schwalje and Mr. Garside's opinion that the subject dryers are "reasonably safe" will mislead and confuse the jury.  This viewpoint suggests that in a complex strict products liability action, a jury is incapable of evaluating this testimony and giving it appropriate weight.  When properly instructed, a jury can be entrusted to appropriately weigh the totality of evidence and testimony presented and determine the ultimate issues in this case.

> **E.**    **Mr. Schwalje and Mr. Garside should be permitted to testify regarding the cause of the subject fires.**

In each of the eight matters, Mr. Schwalje and Mr. Garside concluded that the improper installation of the dryers and/or the failure to maintain the dryers and venting in accord with Electrolux's instructions caused restricted airflow in the subject dryers and caused excessive lint accumulation in the dryers.  Further, the subject fires were caused by the ignition of accumulated lint in the dryers.  Allstate seeks to preclude these opinions on the grounds that Mr. Schwalje and Mr. Garside have not identified a reliable basis for such opinions.  This argument should be rejected, as the Court should find that the "reliability" requirement is satisfied as demonstrated below because the materials considered by and the investigations conducted by Mr. Schwalje and Mr. Garside provide a reliable basis for their opinions concerning the specific cause of airflow reduction in the subject dryers.

Allstate also argues that Electrolux's experts "make no effort to provide an opinion on the cause of the fire with any scientific certainty" and "make no effort to identify the fire sequence involving the next materials ignited."  *See* Allstate's Motion at 12.  To the contrary, while Mr. Schwalje and Mr. Garside have not identified a specific ignition sequence, their opinion is that the

subject fires were caused by the ignition of excessive lint accumulation in the dryer cabinet with no substantive evidence that the fires were caused by any design or manufacturing defect or failure of any internal component of the subject dryers.   *See* Exhibit H (Almodovar - Garside Report), Exhibit I (Bullene – Schwalje Report), Exhibit J (Christie – Schwalje Report), Exhibit K (Gray – Garside Report), Exhibit L (Gutierrez – Garside Report), Exhibit M (Quinn – Garside Report), Exhibit N (Venbrux – Garside Report) and Exhibit O (Weiss – Schwalje Report), attached to Allstate's Motion and filed under seal.

It is significant to note that Allstate does not challenge – and therefore concedes – that Mr. Schwalje and Mr. Garside can offer expert testimony at trial that in general, there is a relationship between airflow restriction and lint accumulation, i.e., that restricted airflow can increase lint accumulation in a clothes dryer and venting.  Further, it is undisputed that there was accumulated lint in the subject dryers and venting.  Allstate's expert, Michael Stoddard agrees with Mr. Schwalje and Mr. Garside that the hi-limit/safety thermostat in each of the subject dryers "operated repeatedly over the lifetime of dryer use due to elevated temperatures behind the drum from a reduction of airflow within the dryer".  *See* Exhibit C (Almodovar – Stoddard Report) at 22, Exhibit D (Bullene – Stoddard Report) at 32, Exhibit E (Christie – Stoddard Report) at 44, Exhibit F (Gray – Stoddard Report) at 27, Exhibit G (Gutierrez – Stoddard Report) at 28, Exhibit H (Quinn – Stoddard Report) at 24, Exhibit I (Venbrux – Stoddard Report) at 30 and Exhibit J (Weiss – Stoddard Report) at 25.

Mr. Schwalje and Mr. Garside based their opinions on sufficient facts and data, including but not limited to, their examination and review of the subject dryers and attached venting, photographs and measurements taken at the fire scene (where available), deposition testimony, voluminous documents produced in discovery concerning the design, testing and manufacture of

the subject dryers, various industry literature and standards, and testing and studies, including the Webster City Lint Accumulation Testing ("WC testing").  These are similar to the facts and data relied upon by Allstate's expert, Michael Stoddard, and are the sorts of facts and data that an expert in the field of dryer fire investigations would rely upon.

The reports issued by Mr. Schwalje and Mr. Garside set forth the voluminous file materials that they reviewed in forming their opinions.  In addition, to the file materials, they also considered additional voluminous "reliance materials" in forming their opinions in these matters.  *See* Exhibit K - List of Frank Schwalje, P.E.'s Reliance Material and Exhibit L – List of Kenneth M. Garside, P.E.'s Reliance Material.  Mr. Schwalje and Mr. Garside personally inspected the available evidence collected from the fire scene, including the subject dryers and the attached venting (where available).  They visually examined the contacts of the hi-limit/safety thermostat in each of the dryers and determined that the thermostats had "cycled" and such cycling is indicative of the dryer having operated with restricted airflow on many occasions.  When the switch opens, the flow of current stops and the heat source for the dryer is turned "OFF" and the opening of the contacts, when current is flowing through them, causes damage or wear to the contact surfaces, typically in the form of pitting accompanied by discoloration of the contact surfaces.  Allstate's expert, Michael Stoddard agrees with Mr. Schwalje and Mr. Garside that the hi-limit/safety thermostat had operated repeatedly over the lifetime of the subject dryers due to elevated temperatures behind the drum from a reduction of airflow within the dryer.  *See* Exhibit C (Almodovar – Stoddard Report) at 22, Exhibit D (Bullene – Stoddard Report) at 32, Exhibit E (Christie – Stoddard Report) at 44, Exhibit F (Gray – Stoddard Report) at 27, Exhibit G (Gutierrez – Stoddard Report) at 28, Exhibit H (Quinn – Stoddard Report) at 24, Exhibit I (Venbrux – Stoddard Report) at 30 and Exhibit J (Weiss – Stoddard Report) at 25.  Mr. Stoddard further states and Mr. Schwalje and Mr.

Garside agree that "[n]umerous factors can cause the dryer to cycle off of the high limit safety, all of which are related to reduced airflow.  These factors could include a restricted exhaust, large loads, leaking internal seals, a blocked lint screen, broken fan, insufficient make-up air, etc., or any combination thereof."  *Id.*

Despite the warnings in the product literature, none of the insureds hired qualified service personnel to clean the interior of the dryer or the venting approximately every 18 months during the time they owned the dryers.  The Owner's Guides/Use & Care Guides for the subject dryers state that "[t]he interior of the dryer, lint screen housing and exhaust duct should be cleaned approximately every 18 months by qualified service personnel.  An excessive amount of lint build-up in these areas could result in . . . possible fire."  *See* Exhibit M (Owner's Guides/Use & Care Guides for the subject dryers).

Mr. Schwalje and Mr. Garside reviewed the photographs from the fire scene, examined the evidence preserved from the fire scene and reviewed the testimony from the insureds, which all confirmed that the subject dryers were installed in violation of Electrolux's instructions[3].  In the Installation Instructions for the subject dryers, Electrolux warns that its exhaust system requirements must be followed for the proper and safe operation of the dryer and that failure to follow the instructions case create fire hazards.  *See* Exhibit N (Installation Instructions for the subject dryers).

Mr. Schwalje and Mr. Garside have a reliable basis for their opinions regarding the specific cause of restricted airflow in the subject dryers because of their knowledge, education and experience in the scientific principles of airflow.  As explained in their reports, all clothes dryers

---

[3] As an exception to this statement, based upon the available information, Mr. Garside concluded that the Venbrux dryer was installed in accord with Electrolux's instructions.  However, Allstate's fire investigator did not preserve or properly document the portions of the rigid permanent vent system or the metal vent hood.  As a result, Mr. Garside was not provided with the opportunity to analyze that evidence.

operate by circulating heated air through a rotating drum to remove moisture from damp clothing using a heat source, and a blower fan to create differences in air pressure.  The airflow diagrams below show the airflow path through the subject dryers.





For a dryer to operate properly, an adequate quantity and velocity of air must be maintained through the dryer while it is operating.  *See* Exhibit H (Almodovar - Garside Report), Exhibit I (Bullene – Schwalje Report), Exhibit J (Christie – Schwalje Report), Exhibit K (Gray – Garside Report), Exhibit L (Gutierrez – Garside Report), Exhibit M (Quinn – Garside Report), Exhibit N (Venbrux – Garside Report) and Exhibit O (Weiss – Schwalje Report), attached to Allstate's Motion and filed under seal.  Air flows from areas of higher pressure to areas of lower pressure. *See id*.  The blower in the dryer creates an area of pressure lower than standard atmospheric pressure at its inlet and an area of pressure greater than the standard atmospheric pressure at its discharge or exhaust.  *See id*.  The air pressure is greater in the heater pan than in the drum and the pressure within the drum is greater than the pressure at the lint screen.  *See id*.  Air flows from the heater pan through the drum and into the blower housing through the front vent and lint filter.  *See id*.  As the air flows through the drum from the heater pan, lint particles released by the drying process are entrained into the air flowing through the drum and are then trapped by the lint filter. *See id*.  Lint particles smaller than the openings in the lint screen will pass through the blower housing and be exhausted into the premises vent system through the dryer exhaust tube.  *See id*. With proper airflow through the dryer, the vast majority of lint that passes through the lint screen is exhausted into the vent system and discharged outdoors.  *See id*.  A very small percentage of the lint passing through the lint screen enters the dryer cabinet.  *See id*.

If a vent system is restricted for any reason or installed improperly, the normal airflow and pressures within the dryer are altered.  The reduced air flow condition causes lint to accumulate in an abnormal fashion inside the dryer, in the heater pan area, in the internal ducting and in the venting.  The presence of excessive lint in a dryer cabinet and heater pan is consistent with the effects of restricted airflow and will not occur in a properly installed and maintained dryer.

Mr. Schwalje and Mr. Garside have a reliable basis for their opinions regarding the specific cause of airflow in the subject dryers because they rely on the WC testing and as a test of a general scientific principle, the testing constitutes reliable "facts and data" upon which an expert may base his opinion. *See Guild v. General Motors Corp.*, 53 F. Supp. 2d 363, 369 (W.D.N.Y. 1999). The testing was conducted properly and is probative of a general scientific principle that is relevant to this action – the impact of restricted airflow on lint accumulation in a clothes dryer. The testing was a straightforward and repeatable test of a general scientific principle performed in a controlled environment. *See* Exhibit O, Webster City Lint Accumulation Testing – Protocols (gas and electric dryers).

In the testing, one dryer was "properly installed" and one dryer had restricted airflow. Per the protocol, "[a]n exhaust simulator [was] installed on the exhaust tube of the second dryer with the following modification: the end diameter of the exhaust simulator [was] reduced to have 85% vent blockage." *See* Exhibit O. The testing supports these well accepted airflow principles (discussed above) that excessive lint accumulation is consistent with the effects of restricted airflow and will not occur in a properly installed and maintained dryer. While the testing was not an effort to replicate the circumstances of the subject fires, Mr. Schwalje and Mr. Garside can reliably apply the results from the testing, i.e. that restricted airflow increases lint accumulation, to their analysis in this matter and identify the specific cause of the restricted airflow in the subject dryers.

Allstate is largely challenging Mr. Schwalje and Mr. Garside's conclusions from their investigation and analysis and when considering expert testimony, "[t]he test of admissibility is not whether a particular scientific opinion has the best foundation or whether it is demonstrably correct. Rather, the test is whether the 'particular opinion is based on valid reason and reliable

methodology.  The analysis of the conclusions themselves is for the trier of fact when the expert is subject to cross-examination.'"  *Oddi v. Ford Motor Co.*, 234 F.3d 136, 145-46 (3d Cir. 2000) (citation omitted).  "A court may conclude that there is simply too great a gap between the data and the opinion proffered."  *Id*. at 146.  However, even where the court believes that "there are better grounds for some alternative conclusion, and that there are some flaws in the scientist's methods, if there are 'good grounds' for the expert's conclusion, it should be admitted."  *Heller v. Shaw Industries, Inc.*, 167 F.3d 146, 152-53 (3d Cir. 1999) (citation omitted).

Here, the Court should find that there is not too great a gap between the data relied on and Mr. Schwalje and Mr. Garside's opinions to render their opinions unreliable.  Mr. Schwalje, Mr. Garside and Mr. Stoddard agree that the hi-limit/safety thermostat repeatedly cycled, which confirms there was restricted airflow within the dryer.  The insureds did not hire qualified service personnel to clean the dryer interior or the venting approximately every 18 months and their failure to ensure that the cabinet and venting were free from obstructions caused restricted airflow in the subject dryers.  This evidence provides good grounds for their opinions regarding the specific cause of restricted airflow in the subject dryers because of their understanding of the scientific principles of airflow and the WC testing, which demonstrated that restricted airflow increases lint accumulation.

The only case Allstate cites in support of its assertion that Mr. Schwalje and Mr. Garside's opinion with regard to the cause of the subject fires should be precluded is *The Automobile Ins. Co. of Hartford a/s/o Sherry Demrick v. Electrolux Home Products, Inc.* ("*Demrick*") case.  Allstate's reliance on the decision in *Demrick* to attack testimony from Mr. Schwalje and Mr. Garside is unavailing.  There are several significant differences between this matter and *Demrick*.  The *Demrick* dryer was in use for approximately 3.5 years before the fire compared to the 6-12

years the subject dryers were in use prior to the fires.  Significantly, the dryers were vented differently.  None of the eight dryers at issue were vented in the same or substantially similar way as the *Demrick* dryer.  "The conclusions of other courts . . . are not binding on this court."  *Superior Precast, Inc. v. Safeco Inc. Co. of Am.*, 71 F. Supp. 2d 438, 449 (E.D. Pa. October 4, 1999).  While the *Demrick* Court limited Mr. Bajzek's testimony, this Court should not reach the same result and for the aforementioned reasons, this Court should find that the materials considered, and investigations conducted by Mr. Schwalje and Mr. Garside provide a reliable basis for their opinions in this matter.

> **F.    Mr. Schwalje and Mr. Garside have not wholesale adopted the testimony and opinions of non-testifying experts and should be permitted to base their opinions on the sorts of facts and data that experts in their field would reasonably rely.**

Allstate contends that Mr. Schwalje and Mr. Garside should be precluded from offering opinions of non-testifying experts previously retained by Electrolux and that they wholesale adopted these opinions.  *See* Allstate's Motion at 16.  To the contrary, Mr. Schwalje and Mr. Garside's opinions in this matter are based upon their independent inspection and analysis of the subject dryers and attached venting (where available), photographs and measurements taken at the fire scene (where available), deposition testimony, voluminous documents produced in discovery concerning the design, testing and manufacture of the subject dryers, various industry literature and standards and testing and studies and their knowledge, training, education and experience as engineers and application of the scientific method and are offered to a reasonable degree of engineering certainty.

Allstate further contends that Mr. Schwalje and Mr. Garside improperly relied on the opinions of non-testifying experts – Trey Morrison, Abid Kemal, Christine Wood and Thomas Bajzek – because reports previously authored by these individuals in other matters and professional

publications/journal articles[4] authored by them appear on a list of materials that Mr. Schwalje and Mr. Garside prepared.  *See* Exhibits K and L.  Allstate's argument suggests a misunderstanding of this list of materials, which Mr. Schwalje and Mr. Garside prepared in an effort to identity the "facts" and "data considered" by them in forming their opinions.  *See* F.R.C.P. 26(a)(2)(ii) (an expert report must contain "the facts or data considered by the witness in forming" all the opinions the witnesses will express).

Further, Federal Rule of Evidence 703 describes the types of materials that an expert may permissibly rely on:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed.  If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinions to be admitted.  But if the facts or data would otherwise be admissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinions substantially outweighs their prejudicial effect.

In their reports, Mr. Schwalje and Mr. Garside reference the publication - Thermal Degradation and Ignition Characteristics of Clothes Dryer Lint.  *See* Exhibit Q - Thermal Degradation and Ignition Characteristics of Clothes Dryer Lint, Journal of Failure Analysis and Prevention (2012), authored by Thomas J. Bajzek, Ronald Pape and Donald Duvall.  They cite to this publication as it provides insight with regard to thermal degradation and the ultimate ignition of lint.  The publication described testing performed to characterize the behavior of dryer lint at

---

[4] These professional publications and journal articles include:  Analyzing Lint Deposition within the Residential Electric Clothes Dryer, *Proceedings of the 2004 International Appliance Technical Conference, March 29-31, 2004, Lexington, Kentucky,* authored by Delmar "Trey" Morrison, Ph.D., Mark MacDonald, Ph.D., and Russell A. Ogle, Ph.D., P.E., CSP; Assessing Electric Dryer Lint Fire Cause Scenarios, *Proceedings of the 2004 International Appliance Technical Conference, March 29-31, 2004, Lexington, Kentucky,* authored by Delmar "Trey" Morrison, Ph.D., Mark MacDonald, Ph.D., and Russell A. Ogle, Ph.D., P.E., CSP; and Thermal Degradation and Ignition Characteristics of Clothes Dryer Lint, Journal of Failure Analysis and Prevention (2012), authored by Thomas J. Bajzek, Ronald Pape and Donald Duvall.

elevated temperatures, including degradation and ignition. *See id*. The testing showed that discoloration of lint can occur, even to the extent of creating a blackened mass of fibrous material, at temperatures well below those at which combustion of lint could occur. The facts and data in this publication are the sorts of facts and data that experts in the field of dryer fire investigations would reasonably rely. As such, Mr. Schwalje and Mr. Garside's reliance on this publication is appropriate and is in keeping with Federal Rule of Evidence 703.

In support of their arguments, Allstate cites to *Muhsin v. Pac. Cycle, Inc.*, which is distinguishable from the instant matter. There, the Defendant sought to exclude the opinion testimony of Plaintiff's expert, James Green. *See Muhsin*, 2012 WL 2062396 (D.V.I. June 8, 2012). Mr. Green was requested to determine the cause of the accident that occurred to the Plaintiff's minor child. *See id*. at *1. It was alleged that the minor child's bicycle broke apart while he was riding it and he suffered injuries as a result. *See id*. Defendant's primary challenge to Mr. Green's expert report was that "his opinion simply regurgitates the opinion of another individual [Dr. Kasbekar] who has not been listed as a trial expert and will not be testifying." *Id*. at *5. Dr. Kasbekar examined and evaluated the front bicycle wheel and concluded that there was a "significant manufacturing defect in the subject wheel." *Id*. at *2. The Court found that Mr. Green's "conclusion that the accident was caused by a wheel that was defectively manufactured relies exclusively on the opinion of Dr. Kasbekar." *Id*. at *9. Further, the Plaintiff advanced "no evidence that [Mr.] Green took any steps to independently verify Dr. Kasbekar's analysis." *Id*.

Here, Mr. Schwalje and Mr. Garside are not parroting the opinions of other individuals. To the contrary, in each of the eight matters, Mr. Schwalje and Mr. Garside independently evaluated the available evidence (as discussed in detail above) and concluded[5] to a reasonable

---

[5] The full expert opinions that Mr. Schwalje and Mr. Garside intend to testify to at trial are contained in their reports. *See* Exhibit H (Almodovar - Garside Report), Exhibit I (Bullene – Schwalje Report), Exhibit J (Christie – Schwalje

degree of scientific certainty that the improper installation of the dryers and/or the failure to maintain the dryers and venting in accord with Electrolux's instructions caused restricted airflow in the subject dryers and caused excessive lint accumulation in the dryers.  Further, the subject fires were caused by the ignition of accumulated lint in the dryers.

III.    **CONCLUSION**

As a result of the foregoing, Electrolux respectfully requests that this Honorable Court deny Plaintiffs' Omnibus Motion in limine to preclude certain expert testimony from Electrolux's experts, Frank Schwalje, P.E. and Kenneth M. Garside, P.E.

Respectfully submitted,

NICOLSON LAW GROUP LLC

BY:     /s/ Melissa L. Yemma
CHERYL M. NICOLSON, ESQ.
Attorney I.D. No. 57422
MELISSA L. YEMMA, ESQ.
Attorney I.D. No. 92194
Rose Tree Corporate Center II
1400 N. Providence Road, Suite 6035
Media, PA 19063
(610) 891-0300
nicolson@nicolsonlawgroup.com
yemma@nicolsonlawgroup.com

JONATHAN F. FECZKO, ESQ.
Admitted *Pro Hac Vice*
TUCKER ELLIS LLP
950 Main Avenue, Suite 1100
Cleveland, OH 44113
(216) 696-3161
jonathan.feczko@tuckerellis.com

*Attorneys for Defendant Electrolux Home Products, Inc.*

---

Report), Exhibit K (Gray – Garside Report), Exhibit L (Gutierrez – Garside Report), Exhibit M (Quinn – Garside Report), Exhibit N (Venbrux – Garside Report) and Exhibit O (Weiss – Schwalje Report) attached to Allstate's Motion and filed under seal.

DATE: <u>January 15, 2019</u>

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLSTATE INSURANCE COMPANY; ALLSTATE | : |
| INDEMNITY COMPANY; ALLSTATE PROPERTY & | : |
| CASUALTY INSURANCE COMPANY; ALLSTATE | : NO. 5:16-cv-04276-EGS |
| VEHICLE & PROPERTY INSURANCE COMPANY | : |
| | : |
| v. | : JURY TRIAL DEMANDED |
| | : |
| ELECTROLUX HOME PRODUCTS, INC. | : |

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that the foregoing Defendant, Electrolux Home Products, Inc.'s Memorandum of Law in Support of its Opposition to Plaintiffs' Motion in limine to preclude certain expert testimony was served electronically on the date stated below, upon the following:

Raymond E. Mack, Esquire
Patrick A. Hughes, Esquire
de Luca Levine, LLC
Three Valley Square
512 E. Township Line Road, Suite 220
Blue Bell, PA 19422

NICOLSON LAW GROUP LLC

BY:   /s/ Melissa L. Yemma
CHERYL M. NICOLSON, ESQ.
Attorney I.D. No. 57422
MELISSA L. YEMMA, ESQ.
Attorney I.D. No. 92194
Rose Tree Corporate Center II
1400 N. Providence Road, Suite 6035
Media, PA 19063
(610) 891-0300
nicolson@nicolsonlawgroup.com
yemma@nicolsonlawgroup.com

JONATHAN F. FECZKO, ESQ.
Admitted *Pro Hac Vice*
TUCKER ELLIS LLP

950 Main Avenue, Suite 1100
Cleveland, OH 44113
(216) 696-3161
jonathan.feczko@tuckerellis.com

*Attorneys for Defendant Electrolux Home Products, Inc.*

DATE: <u>January 15, 2019</u>